'Argued July 10, modified September 19, 1917.

# COLBY *v.* CITY OF MEDFORD.*

(167 Pac. 487.)

**Statutes—Enacting Clauses—Constitutional Law.**

1. Under the Constitution of Oregon (Article IV, Section 1), declaring that "the style of all bills shall be" of a prescribed form, a statute must contain an enacting clause.

**Municipal Corporations—Ordinances—Passage—Form.**

2. A substantial compliance with a charter requirement as to the form of ordinances is sufficient.

**Municipal Corporations—Ordinances—Charter Amendments—Form—Constitutional Law—Enacting Clauses.**

3. Article IV, Section 1, of the Constitution, declaring that "the style of all bills shall be: 'Be it enacted by the people of the state,' etc.," does not apply to municipal ordinances or charter amendments initiated and adopted by the legal voters of a city.

**Municipal Corporations—Charters—General and Special Acts—Ordinances—Form.**

4. Section 3224, L. O. L., relating to forms of ordinances, being one of the sections of a general incorporation act, does not apply to a city incorporated under a special act.

**Municipal Corporations—"Ordinances"—Charters—Amendments—Enacting Clauses.**

5. A section of a charter, providing that all "ordinances" shall contain an enacting clause, which was in the charter before the iniative power to amend the charter was given to the voters of a city, does not apply to amendments to the charter.

**Municipal Corporations—Charter Amendments—"All Measures."**

6. The term "all measures," in a section of a city ordinance requiring enacting clauses, *held* to apply to amendments to the charter, whether initiated by the people or submitted by the council.

**Municipal Corporations—Initiative and Referendum—Elections—Enacting Clause.**

7. Where an ordinance requiring an enacting clause to charter amendments was in effect at the time of the initiative petition, indorsement by the council, and publication of a proposed charter amendment, but such ordinance was amended the day before the election,

---

*On necessity of statute containing enacting clause, see note in **L. R. A.** 1915B, 1060.

On the question of power to impose special assessments by front foot rule, see note in 28 **L. R. A.** (N. S.) 1124.

On assessment of corner lot for public improvements at intersection of street, generally, see note in 50 **L. R. A.** (N. S.) 922, 928.

making an enacting clause unnecessary, the charter amendment was legally adopted, though it contained no enacting clause; the election being the vitalizing act, and all going before being mere formality and preparation.

> [As to construction of initiative or referendum provision in Constitution, statute or municipal charter, see note in Ann. Cas. 1916B, 819.]

#### Municipal Corporations—Ordinance—Passage—Enacting Clause.

8. In the absence of an ordinance, statute or Constitution prescribing it, an enacting clause is not necessary in the passage of an ordinance.

#### Municipal Corporations—Initiative and Referendum—Procedure—Constitutional and Legislative Acts.

9. Section 3482, L. O. L., providing that 90 days elapse between petition and election on an initiative measure, has no application to towns or cities that have prescribed their own procedure, under Article IV, Section 1a, of the Constitution, empowering a city or town to provide its own method, and an ordinance requiring but 30 days is valid.

#### Municipal Corporations—Initiative and Referendum—Ordinances—Procedure.

10. Where a city ordinance provided that the council, if it disapproved an initiative proposed amendment to the charter, could propose a competing amendment to submit at the same election, the voters could also submit such an amendment, though nothing was said about the voters submitting a competing amendment.

#### Municipal Corporations—Initiative and Referendum—"Proposed by the Council"—"Proposed by Initiative Petition."

11. Although a city council caused a certain measure to be prepared, but the legal voters petitioned for the measure, the measure was "proposed by initiative petition," and not "proposed by the council," within the meaning of an ordinance providing that such measures could be proposed by the council or by initiative petition.

#### Municipal Corporations—Bonds—Special Assessments.

12. Sections 3245–3253, L. O. L., providing that certain special assessments can be bonded, do not include bonds for water mains.

#### Constitutional Law—Obligation of Contract—Amendment of Charter.

13. Article I, Section 10, of the United States Constitution, prohibiting a state from enacting any law impairing the obligation of contracts, applies to cities and towns, where they amend their own charters, as they are only agencies of the state, having only the powers which the state has delegated to them.

#### Constitutional Law—Impairing Obligation of "Contract."

14. The term "contract," as used in Article I, Section 10, of the United States Constitution, is given its ordinary meaning, and means a voluntary agreement of minds, upon a sufficient consideration, to do or not to do certain things, and embraces and includes all those laws which exist at the time and place where the contract is executed and where it is to be performed, and affect the validity, construction, discharge and enforcement of the contract.

**Constitutional Law—"Obligation of Contract"—"Impairing Obligation of Contract."**

15.   The "obligation of a contract" is the law or duty which binds the parties to perform their agreement, which depends upon the laws in existence when the contract is made; hence, if the duty to perform is lessened, and either party is deprived of the benefit of his contract, or new conditions imposed, adding new duties, either by the repeal or passage of a statute, the obligation of the contract is "impaired," within the meaning of Article I, Section 10 of the United States Constitution; but this does not prohibit a change in the remedy if the new remedy is as substantial as the other.

**Municipal Corporations—Improvements—"Contract"—"Impairing Obligation of Contract."**

16.   Where, under Sections 3245–3253, L. O. L., a property owner takes the privilege of paying a special assessment in installments and waives all irregularities as provided therein, there is a "contract," and an amendment, changing the number and amounts of the installments without the consent of the owner, is invalid, as "impairing the obligation of a contract," within the meaning of Article I, Section 10 of the United States Constitution, and it is no defense that the change is advantageous to the owner.

**Municipal Corporations—Assessments—"Contract"—"Impairing Obligation of Contract"—Taxation.**

17.   Where, under Sections 3245–3253, L. O. L., a property owner takes the privilege of paying a special assessment in installments, and waives all irregularities as provided therein, there is a "contract"; but an amendment to the charter which increases the penalties upon delinquency does not "impair" its obligations, laws prescribing procedure and method of collecting delinquent assessments being but remedies, and not "contracts," within the meaning of Article I, Section 10, of the United States Constitution.

**Municipal Corporations—Contracts—"Taxation."**

18.   The power to assess for special benefits is embraced in the power of taxation; and when it is alleged that a city has surrendered by force of contracts any part of its sovereign power to tax, the agreement must be clearly manifested.

**Taxation—"Interest"—"Penalty."**

19.   Interest, when charged on a delinquent tax, is a penalty to insure prompt payment, and is not a consideration for the forbearance of money, or a part of the tax.

**Municipal Corporations—Assessments—Delinquency—Sale—Who may Buy.**

20.   It is competent to authorize a city to purchase land, in the absence of bidders at a delinquent assessment sale, even though the legislation conferring the authority is enacted after an assessment is made and before the sale for delinquency.

**Municipal Corporations—Power to Assess—Waiver of Liens.**

21.   Where a city fails to enforce payment of special benefit assessments, and levies a general tax to pay interest on the bonds for such improvements, it does not waive its lien on the property.

**Municipal Corporations—Special Benefit Assessment Bonds—Liability.**

22.   Sections 3245–3253, L. O. L., providing for the issuance of bonds to cover special benefit assessments, contemplates that such bonds shall be regarded as liabilities of the city, which the city must pay, without regard to whether the assessments have been or can be collected.

**Municipal Corporations—Special Benefits—Bonds—Taxation.**

23.   A general tax by a city to pay interest on bonds issued to cover special benefit assessments, under Sections 3245–3253, L. O. L., *held* not invalid; the bonds being a debt of the city.

**Municipal Corporations—Taxation—Assessments—Payment of Interest.**

24.   Where a general tax was levied by a city to pay interest on bonds issued to cover special benefit assessments, under Sections 3245–3253, L. O. L., the refusal of the city to accept the tender by a property owner of the assessments without interest was proper.

**Municipal Corporations—Constitutional and Statutory Provisions.**

25.   The amendments to Article IV, Section 1a, providing for initiative and referendum, and Article XI, Section 2, of the constitution, relating to incorporation of municipalities, have not shorn the legislature of power to enact general laws concerning cities and towns.

**Municipal Corporations—Special Benefit Assessments—Statutes.**

26.   Sections 3245–3253, L. O. L., providing that owners of property may postpone payment of assessments by dividing them into installments, applies to every incorporated town and city, and although a city can legislate concurrently on the same subject, it cannot compel an owner to accept its plan.

**Municipal Corporations — Paving — Procedure — Notice — Protest — Laches.**

27.   Where a city council at different times passed resolutions of intention to pave two parts of a street, in which there were defects in publication and posting, but afterward passed a resolution of intention to pave the whole included parts of the street, with proper notice and publication, the council having unlimited power to contract, except that proper notice should be given of the assessments and intention to pave, and a chance given for protest, such defective resolutions cannot invalidate the improvement and assessment proceedings as to a property owner who did not protest at the time and waited six years before protesting.

**Municipal Corporations—Improvements—Records.**

28.   The words "whereas, no protests were received," in a resolution ordering paving, and "no protests having been filed," in the assessment ordinance, is a sufficient showing as to the question of protests after six years.

**Municipal Corporations—Special Benefit Assessments—Bonds.**

29.   Under Sections 3245–3253, L. O. L., relating to bonding cities, and providing that no application to pay assessments in installments shall be received if the amount of the assessment, with any previous unpaid assessment, "shall equal or exceed the valuation of said prop-

erty, as shown by the last tax-roll," it is immaterial that the actual value is less than the assessment.

**Municipal Corporations—Improvements—Assessments—Amount—Conclusiveness.**

30.   Where no fraud is alleged, and the owner admits some benefit from an improvement, a finding by the city council "that the special and peculiar benefit accruing upon each lot * * and in just proportion to benefits" was the amount so assessed is conclusive.

**Municipal Corporations—Paving—Front Foot Rule—Validity.**

31.   The front foot rule of assessment for paving is valid.

**Municipal Corporations—Paving—Street Intersection—Special Assessments—Discretion of Council.**

32.   Where it is discretionary with a city council to include or exclude the cost of intersections when making paving assessments, it cannot be prevented from levying special assessments for an improvement, even though it has in the past paid for the same kind of improvement by general taxation.

Department 1.    Statement by MR. JUSTICE HARRIS.

This suit was commenced against the City of Medford, its mayor, councilmen, recorder and treasurer, by Charles D. Colby, who is not only making certain contentions because of the methods previously pursued by the city in raising moneys with which to pay the interest on the bonded indebtedness for improvements, the expense of which had been charged to abutting property by levying special benefit assessments, but he is also attacking an alleged charter amendment known as the Hanson Plan, which was designed to enable the city to refund all its bonded and other indebtedness for paving, sewers and water-mains.   After Colby had filed his complaint, and with the consent of all parties, William Stailey filed a separate complaint in this suit against the same parties who had been named as defendants in the Colby complaint; and, hence, this proceeding really involves two suits which, for convenience, have been consolidated into one suit.   The assault made by the Stailey complaint is especially directed against the special benefit assessments which the city levied on abutting property, while the Colby

complaint admits the regularity of all the improvement proceedings as well as the validity of all the original special benefit assessments. No evidence was offered by any of the parties in the Circuit Court, and the suit was tried and decided on such admissions as are found in the pleadings, together with certain admissions contained in a written stipulation entered into by the parties concerning the facts and the issues. While most of the facts are either admitted in the pleadings or agreed upon in the stipulation, there are yet some conflicting allegations which the parties were unable to reconcile.

We can more readily understand the nature of this complicated controversy if we first look to the voluminous pleadings and extract from them and the stipulation a condensed statement of the transactions which brought about the conditions existing in the latter part of 1916, at which time it was deemed advisable to submit some method to the legal voters for refunding part or all of the indebtedness of the city; and then it will be appropriate to notice the provisions of two different methods which were devised and submitted to the legal voters, one being known as the Medynski Plan and the other as the Hanson Plan. After referring to the causes which produced the conditions found to exist in 1916, and explaining the provisions of the Medynski and Hanson Plans, attention can be directed to such facts as particularly affect Colby and then to those facts which form the basis of the contentions made by Stailey.

Commencing with the year 1907, and ending with the year 1913, the city of Medford made extensive improvements. Streets were paved; sewers were constructed; and water-mains were laid. The city levied special benefit assessments against the abutting prop-

erty for the purpose of raising funds to pay for these improvements. The expense of the pavement, sewers and water-mains aggregated a large sum; and the cost of the paving alone was approximately $1,000,000. After receiving notice of the special assessments levied against their property for paving and sewers, most of the abutting property owners made application under the statute, commonly known as the Bancroft Bonding Act, to pay their assessments in ten annual installments; and then the city issued bonds as provided by the Bancroft Bonding Act. The charter contains provisions which are modeled after the Bancroft Bonding Act and enable the owner of abutting property to pay an assessment, levied on his property for the laying of water-mains, in installments by filing an application with the city, and the city can then issue bonds in an amount equal to such an assessment; and although it is not in terms alleged in the pleadings that applications were so made under the charter, it is nevertheless a fair inference to say that many of the owners of property assessed for water-mains applied for and were granted the right to pay their water-main assessments in installments. While the parties were unable to agree upon the number, yet, they do agree that some of the abutting property owners neither paid their assessments nor brought themselves within the Bancroft Bonding Act. In some instances where the property owner had not applied for the right to pay his assessment in installments, the city continued the assessment on the lien docket without attempting to enforce collection. Some of the abutting property against which special assessments were levied was not worth as much as the amount of the assessment, either before or after the street improvement was completed, although the special benefit assessment was less

than the valuation of the property as shown by the last tax-roll of the county. The assessed valuation appearing on the county tax-roll was always greater than the amount of the special assessment on a lot, but the real value of a given lot was in some instances less than the amount of the special assessment imposed upon such lot for a street improvement. With the opening of the year 1914, many of the property owners began to discuss and question the validity and amount of the assessments levied against their property for the various improvements, with the result that, in addition to those who had neither paid their assessments in full when due nor applied for the privilege of paying in installments, many property owners who had brought themselves under the Bancroft Bonding Act refused to pay the installments that matured in the years 1914, 1915 and 1916. The bonds which the city had issued under the Bancroft Bonding Act carried interest and this interest was payable semi-annually. Because of the failure of some of those who had not brought themselves within the Bancroft Bonding Act to pay the whole of their assessments when due, and on account of the refusal of many of the property owners who had come under the Bancroft Bonding Act to pay the annual installments, principal and interest, there were no moneys in the treasury with which to pay the interest due each year on the bonds which had been issued under the Bancroft Bonding Act; and it therefore became necessary for the city to take some steps to raise enough money to satisfy the interest. Instead of exercising the power given to it by its charter and enforcing the collection of delinquent assessments by selling the property charged with the assessment, the city resorted to general taxation; and, in each of the years 1914, 1915 and 1916, a tax was levied on all the

taxable property in Medford for the purpose of raising money with which to pay interest on the outstanding bonds.  By October, 1916, the city had become indebted in large sums.  A portion was for the general expenses of the city and was represented by outstanding warrants; a part was for water-mains and was represented by water-main bonds issued by authority of the charter; and the remainder of the indebtedness was for street improvements and sewers and in the main was represented by bonds issued under the provisions of the Bancroft Bonding Act.  This was the condition of the finances of the city when on October 3, 1916, the Medynski Plan was submitted and on December 19, 1916, the Hanson Plan was submitted for approval or rejection by the voters at an election to be held on January 9, 1917.

Each plan was a refunding plan, although one proposed to refund more of the indebtedness than the other.  The Medynski Plan was designed to refund the paving indebtedness only, while the Hanson Plan proposes to refund all the existing indebtedness incurred in the improvement of streets and in laying sewers and water-mains.  The two plans are different in other respects.  The Medynski Plan relies entirely upon general taxation to pay the indebtedness; but the Hanson Plan looks primarily to the abutting property for the funds.

THE MEDYNSKI PLAN: This plan proposed to declare street improvements public necessities, to release all property from the liens of assessments for street improvements, and to reimburse property owners who had made any payments on assessments for street improvements.  It provides that the city shall assume all indebtedness for street improvements and refund the debt by the issuance of bonds; that the city shall

pay the indebtedness for street improvements by levying a tax on all taxable property within the municipality; and that the time for the ultimate payment of the indebtedness shall be extended by dividing the debt into fifteen equal payments to run for a period of twenty years with interest, the interest to be paid annually during the first five years and the payments on the principal to commence in the 6th year.

The Hanson Plan: This alleged charter amendment is entitled:

"An Act to Amend the Charter of the City of Medford, by adding thereto a new chapter to be known as Chapter 14, consisting of Sections 139 to 170, both inclusive, relating to special assessments for local improvements for paving and otherwise including sewer and water-main heretofore levied and assessed, providing for the collection thereof and the enforcement of such liens and assessments and the issuance and sale of refunding bonds, therefore, to read as follows":

The opening section reads thus:

"All unpaid assessments heretofore levied and assessed for street improvements by paving or otherwise, including sewers and water-mains, whether bonded under the provisions of the Laws of the State of Oregon or the city charter of the City of Medford, or not bonded, shall be collected and collections of such liens enforced as in this act provided. The city council shall by ordinance fix a date when all such unpaid assessments with interest thereon to such date may be paid in whole or in part, notice whereof shall be given as herein provided. The amount of principal and interest of such assessments remaining unpaid at the expiration of such date shall constitute an unpaid balance which, with interest thereon at the rate expressed in the refunding bonds in this act provided for, shall be payable in thirteen (13) years from and after such date during each of the first three years of which only

interest upon such unpaid balance must be paid, and during each of the last ten years of which period there shall be payable one-tenth of such unpaid balance with interest at the bond rate upon the whole unpaid sum. In addition to the annual payments herein required, the option is accorded to pay at the time of each annual payment, one or more tenths of the unpaid balance, but any such optional payment shall be considered as payment of the last maturing installment or installments as the case may be: Provided, that the city council may by ordinance provide for semi-annual payments of interest and principal.''

Subsequent sections provide for transferring all special assessments previously made to a lien docket which is called the ''consolidated lien docket.'' The city council is required by ordinance to create a consolidated improvement district comprising street, sewer and water-main improvements where any special assessments remain unpaid. The consolidated lien docket is placed in the hands of the city treasurer for collection, and he is directed to notify property owners that they may pay their unpaid assessments within the time specified in the notice. If a property owner fails to pay any such assessment within the period fixed by the notice given by the treasurer, then, upon the expiration of 20 additional days,

''the city council shall by ordinance authorize the issue of the refunding improvement bonds of the city in an amount equal to the unpaid balance of such assessments, existing at the expiration of the date hereinabove provided for, in convenient denominations not exceeding Five Hundred ($500) Dollars each; and such bonds shall by the terms thereof be payable on or before a date not to exceed fifteen (15) years from and after the date of such bonds which latter date may be fixed by resolution and be payable in their numerical order in gold coin of the United States and bear interest not to exceed six (6) per cent per annum in-

terest payable semi-annually or annually, said interest to be evidenced by coupons attached to said bonds."

The city council is authorized to provide for the sale of the refunding bonds; and the money derived from the sale of these bonds

"shall be applied to the redemption and payment of the outstanding and unpaid City of Medford Improvement Bonds and Warrants for paving, sewers, and water-mains, and to the redemption and payment of coupons of such bonds held by the city and representing moneys advanced by it from taxes and otherwise from its various funds by way of loans to meet, from time to time, maturing interest payments in bond fund districts hereinbefore consolidated."

If any installment of interest or principal is not paid when due it "shall thereupon become delinquent, and shall bear a penalty of five (5 per cent) per centum upon the amount of such delinquency, in addition to the bond rate upon the principal sum so delinquent." The Hanson Plan also contains elaborate provisions for the sale of property where any installment is due or an assessment has become delinquent; it contains sections appertaining to the redemption of property sold for delinquent assessments; and it speaks of reassessments and other subjects not now necessary to notice.

At the city election, held on January 9, 1917, the legal voters rejected the Medynski Plan and approved the Hanson Plan; and, unless the Hanson Plan is adjudged illegal, the city will at once proceed to execute all the powers specified in the measure, will enter unpaid assessments in the consolidated lien docket, give notices, sell bonds and refund all the existing indebtedness for sewers, pavement and water-mains, as provided for by the Hanson Plan.

Charles D. Colby is a legal voter and taxpayer of Medford. In 1916, he became the owner of lot 3 in

block 59 abutting on North Grape Street.   Pavement was laid on this street and the cost of the improvement, including street intersections, was assessed, according to the front foot rule, against the abutting property. John M. Deward owned lot 3 at the time the pavement was laid; and, when notified that an assessment of $284.50 had been levied against his property, he filed an application on November 17, 1911, for the privilege of paying the assessment in installments as provided by the Bancroft Bonding Act.   The installments were regularly paid until 1914.   After having paid all the taxes levied against his property, including the general tax which the city had levied in 1914 for the purpose of raising funds to pay the interest on the outstanding bonds which had been issued under the Bancroft Bonding Act, Colby tendered to the city the installment due on the street assessment against his property, less the interest.   The city declined to accept the tender, claiming that Colby was obliged to pay interest as well as principal.   Colby refused to pay more than the installment due on the principal, claiming that he had already paid the interest by paying his general taxes.   Colby paid the taxes levied against his property during each of the years 1914, 1915 and 1916, but he did not pay any installments on the principal of the street assessment levied on his lot.

William Stailey has been a taxpayer of Medford since 1909.   He owns six lots abutting on South Grape Street.   Lot 6 is a corner lot and abuts on Sixteenth Street as well as on South Grape Street.   Pavement was laid on South Grape Street and in 1911 the cost of the improvement, including street intersections, was assessed according to the front-foot rule against the abutting property.   An assessment of $256 was levied on each of the six lots on account of the South Grape

85 Or.—32

Street pavement, and, in 1912, an additional $444 was charged against lot 6 for its share of the expense incurred in paving Sixteenth Street. Although each lot was assessed by the county assessor for more than the amount of the special assessment levied against it, nevertheless, in truth, both before and after the completion of the improvements, each lot was and now is worth less than the special assessment charged against it. Stailey did not make application for the privilege of paying his assessments in installments and consequently the full amount of the assessments for South Grape Street became due in 1911 and for Sixteenth Street in 1912.

Based upon grounds which will be stated and considered hereafter, Colby prays for a decree adjudging the Hanson Plan void and enjoining the sale of bonds under it; and, further, that the city be required to accept the principal of the unpaid assessments less the interest collected by general taxation, or else that the city be enjoined from collecting any of the special assessments for street improvements and that the municipality be compelled each year to levy a sufficient millage tax on all the taxable property to meet the maturing indebtedness.

The prayer of the Stailey complaint is for an annulment of the special assessments imposed upon his property and that the city be required to levy a sufficient millage tax against all the taxable property to pay the outstanding indebtedness.

The trial court rendered a decree adverse to the contentions made by Stailey, and also decreed that the Hanson Plan was invulnerable to attack, and that it is a valid amendment to the city charter. The plaintiffs appealed.        MODIFIED.

For appellants there was a brief and an oral argument by *Mr. F. J. Newman.*

For respondents there was a brief over the names of *Mr. Fred W. Mears, Mr. Alfred E. Reames* and *Mr. Howard A. Hanson,* with oral arguments by *Mr. Mears* and *Mr. Reames.*

MR. JUSTICE HARRIS delivered the opinion of the court.

The foregoing detailed statement may be summarized thus: The city had laid sewers, pavement and water-mains and had assessed the cost of these improvements to the abutting property; most of the owners of property assessed for sewers and pavement had made application to pay their assessments as provided for by the Bancroft Bonding Act; presumably most of the owners of abutting property which was charged with the cost of laying water-mains had applied for the privilege of paying these assessments in installments as provided for by the municipal charter; some property owners, who had not applied for the privilege of paying sewer and street assessments as permitted by the Bancroft Bonding Act, as well as some owners who had not secured permission to pay water-main assessments in installments as authorized by the charter, did not pay their assessments when they became due; commencing with the year 1914, many property owners who had secured the right to pay their assessments in installments refused to pay the installments as they matured; bonds had been issued under the Bancroft Bonding Act for street and sewer improvements in an amount equal to the total amount of the assessments brought within the Bancroft Bonding Act; bonds had been issued under the provisions of the charter for

water-mains in an amount equal to the total water-main assessments which had been brought within those provisions of the charter which permit the owner to pay in installments; in 1914, the city owed a large sum for pavement, sewers and water-mains; some of this indebtedness had not been transferred into bonds, but most of it was represented by bonds which were then outstanding, the water-main bonds having been issued under the city charter and the sewer and paving bonds having been issued under the state law known as the Bancroft Bonding Act; the outstanding bonds authorized by the Bancroft Bonding Act aggregated considerably more than half of a million dollars and the total paving indebtedness, bonded and otherwise, approximated $1,000,000; because of a failure of many of the property owners to pay their assessments, when they became due, there was no available money in the treasury to pay the outstanding indebtedness and it therefore became necessary in each of the years 1914, 1915 and 1916, to levy a sufficient general tax to pay the interest which matured annually; two plans to refund indebtedness were devised, one being known as the Medynski Plan and the other as the Hanson Plan; the Medynski Plan proposed to refund the paving indebtedness only, while the Hanson Plan is designed to refund the paving, sewer and water-main indebtedness, whether bonded or otherwise; both plans were submitted to the legal voters at an election, with the result that the Medynski Plan was rejected and the Hanson Plan approved. The defendants aver that the Hanson Plan was regularly adopted and that it is now a part of the municipal charter; and, unless the Hanson Plan is held to be invalid, the city intends to sell bonds and refund all the sewer, paving and water-main in-

debtedness in the manner prescribed by the Hanson Plan.

Colby does not question the regularity of any of the improvement proceedings, nor does he assail the validity of any of the original special assessments; but he does contend that the Hanson Plan was not regularly adopted, and that, even though it be assumed that it was regularly adopted, it nevertheless cannot be enforced against the lot owned by him. He contends that the proceedings were irregular because: (1) The measure was at all times without an enacting clause; and (2) it was a measure which competed with the Medynski Plan and was not filed within the time prescribed for the filing of competitive measures. Colby says, too, that the city cannot lawfully enforce the provisions of the measure, even if it should be concluded that the procedure was faultless. He insists that the application filed by Deward for the right to pay under the terms of the Bancroft Bonding Act and the acceptance of the application by the city created a contract, the obligations of which cannot be impaired by changes which will be wrought by the Hanson Plan. The contention is that the Hanson Plan changes the time for payment, alters the amount of the installments; imposes penalties not contemplated by the Bancroft Bonding Act, and increases the burdens upon the Colby lot by enabling the city to purchase property at delinquent assessment sales and thus remove it from taxation. Colby concedes that the city can pay for paving by assessing the cost against abutting property, or by levying taxes on all the taxable property in the city; but he contends that the city cannot do both. He argues that when taxes were levied on all the taxable property in 1914, 1915 and 1916, and paid by the owners of the property taxed, the levy and payment of such

taxes operated as an election by the city, consented to by the property owners, to pay for the improvements with taxes collected from all the taxable property; and that the city should be compelled to pay all the paving indebtedness by general taxation, because it would be inequitable to permit an enforcement of the special assessments.

Stailey does not admit that the improvement and original assessment proceedings were regular. If, however, it is ruled that the improvement and assessment proceedings were valid, or are now unassailable, he argues that to enforce the assessment against his six lots: (1) Would be tantamount to confiscation; (2) would result in unequal and double taxation (a) because his lots are charged with their share of the expense of paving the street intersections on Grape Street, and at the same time are taxed for the expense of paving the street intersections on Main Street and Oakdale Avenue where the expense of the street intersections was not charged against the abutting property; and (b) because the city permitted many property owners to file applications under and to obtain the privilege of the Bancroft Bonding Act when their property was worth less than the amount of the assessment, and, since such property cannot be sold for the amount of the assessment against it, the difference must of necessity be collected by general taxation, and consequently the Stailey lots will be compelled to pay the assessments imposed upon them and also a part of the assessments levied against other property.

The measure known as the Hanson Plan was at all times without an enacting clause. The Hanson Plan and The Medynski Plan were submitted at the same election and it is manifest that the former was a competitive measure. It is true that the scope of the Han-

son Plan was broader than that of the Medynski Plan; but it is also true that each plan provided for the refunding of the indebtedness incurred for street pavement.    If both measures had received a majority of the votes, and if the vote had been exactly the same for and against each measure, all persons would probably agree that as to street paving indebtedness each measure conflicted with the other and both could not be applied to the street paving indebtedness.    If A conducted a grocery store on one side and B had a combined grocery and hardware store on the other side of the street it probably would be difficult to convince either that the other was not a competitor in the grocery business. Each measure competed with the other for the votes of the electors and each was a competitor of the other on the subject of refunding the paving indebtedness. Before attempting, however, to ascertain the effect of the omission of the enacting clause, or to determine whether its character as a competitive measure prevented the Hanson Plan from being legally adopted, it will be necessary first to refer to some facts not already mentioned.

An initiative petition for the submission of the Medynski Plan to the legal voters was filed with the recorder on October 3, 1916.    This petition was signed by a sufficient number of qualified electors and in every respect complied with the ordinance regulating the exercise of the power of the initiative reserved to the legal voters of cities and towns.    The recorder transmitted the petition to the city council.    Thirty days expired without any action being taken by the city council and the recorder then took possession of the petition and regularly caused the Medynski Plan to be printed on the ballots as a proposed amendment to the

charter to be rejected or approved by the legal voters of the city.

The council employed an expert to investigate the financial affairs of the municipality. This expert reported to the council that in order to protect the credit of the city it would be necessary to refund the sewer, water-main and street improvement indebtedness. Acting on this report the city council caused an initiative petition to be drawn and circulated for the submission of the Hanson Plan to the electorate. After being signed by more than the required number of qualified electors, the petition was regularly filed with the recorder of the city on December 19, 1916. Colby alleges in his complaint that the recorder immediately transmitted the petition to the city council, and that on the same day, December 19, 1916, the council ordained the measure. The recorder then caused the Hanson Plan to be printed upon the ballots as a proposed amendment to the charter for rejection or approval by the legal voters of the city. The election occurred on January 9, 1917, and resulted in the approval of the Hanson Plan and the rejection of the Medynski Plan; and on January 13, 1917, the mayor of the city published his proclamation declaring that the Hanson Plan was in full force and effect as a part of the city charter.

At the time of the election the municipality was operating under a charter which had been originally enacted by the legislature and subsequently amended in some particulars by the legal voters of the city in the exercise of the initiative. Section 23 of the charter as originally enacted by the legislature, and as still in force, provides that: "All ordinances shall contain the enacting clause, 'The City of Medford doth ordain as follows.'" In 1907, the city council passed ordi-

nance No. 124 and amendatory ordinance No. 125, prescribing the procedure to be observed in the exercise of the initiative and referendum powers which had been reserved to the legal voters of cities and towns in 1906 by the adoption of the amendments to the Constitution known as Article IV, Section 1a, and Article XI, Section 2. Section 14 of ordinance No. 124 reads thus: "The enacting clause of all measures submitted to the people and approved by them shall be: 'The people of Medford do ordain as follows.'" Other sections of this and the amendatory ordinance material to this discussion are as follows:

"Enactments or amendments of the city charter of the city of Medford, Oregon, may be proposed by the city council thereof by ordinance or resolution receiving the affirmative vote of a majority of said council, and approved by the mayor, or by initiative petition signed by not less than fifteen (15) per cent of the legal voters of said City of Medford, and submitted to the voters of said city for approval or rejection as hereinafter provided, at a general election or a special election called by the said council for such purpose. Ordinances may be proposed by initiative petition signed by not less than fifteen (15) per cent of the legal voters of said city for approval or rejection, by order of the city council, approved by the mayor, or by referendum petition signed by not less than ten (10) per cent of the legal voters of said city, as hereinafter provided * * ": Section 1.

"Not less than two weeks before any regular or special election at which any ordinance, part of an ordinance or proposed charter amendment is to be submitted to the people, the recorder shall cause to be printed in a newspaper published in and of general circulation in said city of Medford, Oregon, a full and correct copy of the title and text of each measure to be so submitted, with the numbers and forms in which the ballot title thereof will be printed on the official ballot and the recorder shall also cause similar copies to be

posted in three public places in said city for a period of not less than two weeks immediately prior to such election": Section 9.

"If any ordinance, or amendment to the charter of said city shall be proposed by initiative petition, said petition shall be filed with the recorder and he shall transmit it to the next session of the council, who shall then either ordain or reject the same, and if the council shall reject said proposed measure, or shall take no action thereon for a period of thirty days after such measure shall have been submitted, then the said recorder shall cause the same to be submitted to the people for approval or rejection at the next ensuing election held in said city. The council may ordain said ordinance or amendment and refer it to the people, or it may ordain said ordinance without referring it to the people, and in that event, it shall be subject to referendum petition in like manner as other ordinances. If the council shall reject any such measure, or take no action thereon, it may ordain a competing ordinance or amendment, which shall be submitted to the vote of the people by the recorder at the same election at which said initiative proposal is submitted. Such competing measure, if any, shall be prepared by the council and ordained within the thirty days allowed for its action on the measure proposed by initiative petition. The mayor shall not have power to veto either of said measures": Section 13.

A few days prior to the city election it was discovered that the Hanson Plan was without an enacting clause; and, therefore, on January 8, 1917, the day before the election, the council passed ordinance No. 865, amending Section 14 of ordinance No. 124, so as to make it read thus: "No enacting clause shall be necessary on measures enacted by the people." The ordinance contained an appropriate emergency clause and on the day of its passage was signed by the mayor and it became effective immediately.

1, 2. State Constitutions usually contain provisions
declaring that all bills shall contain an enacting clause
of a prescribed form. In some jurisdictions it is held
that such a provision in a Constitution is only direc-
tory; but in Oregon, as well as in most of the states, a
provision in the state Constitution declaring that "the
style of all bills shall be" of a prescribed form, is con-
strued to mean that a statute must contain an enacting
clause. In some states the enacting clause must corre-
spond exactly with the form found in the Constitution,
while, in others, an enacting clause, substantially like
the one prescribed, will be sufficient. Illustrations
may be found in *Cape Girardeau* v. *Riley,* 52 Mo. 424
(14 Am. Rep. 427); *McPherson* v. *Leonard,* 29 Md.
377; *People* v. *Dettenthaler,* 118 Mich. 595 (44 L. R. A.
164, 77 N. W. 450); *State* v. *Rogers,* 10 Nev. 250 (21
Am. Rep. 738); *Commonwealth* v. *Illinois C. R. Co.,*
160 Ky. 745 (170 S. W. 171, L. R. A. 1915B, 1060);
*State* v. *Wright,* 14 Or. 365, 374 (12 Pac. 708). See,
also: 36 Cyc. 967. Following the doctrine announced
in *Cape Girardeau* v. *Riley,* 52 Mo. 424 (14 Am. Rep.
427), the same court ruled that the omission of an
enacting clause did not invalidate an ordinance, even
though the charter prescribed the form and required
the insertion of an enacting clause: *City of St. Louis*
v. *Foster,* 52 Mo. 513. In *Chicago & E. I. R. R. Co.*
v. *Hines,* 82 Ill. App. 488, it was held on the authority
of the *City of St. Louis* v. *Foster, supra,* and *People*
v. *Murray,* 57 Mich. 396 (24 N. W. 118) that the omis-
sion of an enacting clause did not invalidate an ordi-
nance even though directed by the municipal charter;
but a contrary conclusion was reached in *Milton Bur-
rough* v. *Hoagland,* 3 Pa. Co. Ct. 283. In *Galveston,
H. & S. A. Ry. Co.* v. *Harris* (Tex. Civ. App.), 36
S. W. 776, the court held that, where a state law re-

quired ordinances to contain an enacting clause, an omission of the clause invalidated the ordinance. In Oregon it has been decided that a substantial compliance with a charter requirement is sufficient: *State* v. *Kelsey*, 66 Or. 70, 77 (133 Pac. 806). See, also: *State* v. *Dalles City*, 72 Or. 337, 350 (143 Pac. 1127).

3. If the Constitution of this state prescribed the form and ordered the use of an enacting clause in an ordinance or other municipal measure, then the omission of an enacting clause would render the measure void; and, for the purposes of the instant case we may assume that an enacting clause must be used if the charter or a state law so provides. We now inquire, therefore, whether the Constitution, or a statute or the city charter required the Hanson Plan to contain an enacting clause. In Article IV, Section 1 of the State Constitution, it is declared that: "The style of all bills shall be: 'Be it enacted by the people of the state of Oregon.' " Manifestly, this provision of the Constitution neither applies to municipal ordinances nor to a charter amendment initiated and adopted by the legal voters of a city or town. In this connection it is interesting to note, in passing, that in the State of Oklahoma where, as here, the people exercise the initiative and referendum powers, a constitutional provision like ours was held to apply only to direct legislation by the people and it was decided that a measure enacted by the legislature was valid, even though it entirely omitted an enacting clause: *Ex parte Hudson*, 3 Okl. Cr. Rep. 393 (106 Pac. 540, 107 Pac. 735).

4. A state statute is relied upon by Colby and he points to Section 3224, L. O. L. This section, however, has no application for the reason that it is one of the sections of an act passed in 1893: "For a general law for the incorporation of cities and towns in the State of

Oregon.'' Section 3224, L. O. L., is a part of the charter of cities and towns incorporated under that general law, but the City of Medford was incorporated under a special legislative act which was followed by subsequent special legislative acts defining the powers of Medford, and hence Section 3224, L. O. L., does not apply to Medford.

5. It is argued that Section 23 of the city charter requires an enacting clause; but upon examination it will be seen that this section of the charter only applies to ordinances. The Hanson Plan was submitted, on an initiative petition, to the people as a charter amendment and not as a mere ordinance. When the last charter was enacted by the legislature in 1905, the legal voters of cities and towns were without power to amend their own charters, for it was not until 1906 that the initiative power was conferred upon the legal voters of cities and towns, and, consequently, it is obvious that Section 23, at the time of its original amendment, could only apply to pure ordinances. In the sections of our state Constitution dealing with the initiative and referendum powers, a distinction is constantly recognized between a statute and an amendment to the Constitution; and so, too, the same distinction was recognized by the legislature when it enacted Chapter 226, Laws 1907, codified in Sections 3470 to 3483, L. O. L., inclusive, prescribing the procedure for the exercise of the initiative and referendum powers, and the legislature likewise appreciated the difference between an amendment to a charter and a mere ordinance, for Chapter 226, Laws 1907, carefully differentiates ordinances from charter amendments. Section 23 of the charter has not been changed since its original enactment; it speaks now as it did before of ''ordinances'' only; and, hence, its mandate only

applies to ordinances. We, therefore, conclude that neither the state Constitution nor any state law applicable to Medford nor its present city charter compels the use of an enacting clause in a charter amendment which has been initiated and submitted upon a petition of legal voters.

6. Colby argues, however, that Section 14 of ordinance No. 124, required an enacting clause in the Hanson Plan. The language of this ordinance includes charter amendments, whether initiated upon a petition of the voters or submitted by the council, as well as ordinances submitted to the people, for the reason that the words "all measures" are employed. Running throughout ordinance No. 124, is a plain recognition of the distinction between charter amendments and ordinances; and, therefore, when Section 14 commands that "all measures" submitted to the people shall contain the prescribed enacting clause, the inevitable conclusion is that the section includes charter amendments as well as mere ordinances, for the reason that the term "measures" is comprehensive and includes charter amendments. The Hanson Plan was not initiated and voted upon as a pure ordinance; but it was initiated upon a petition signed by legal voters and was voted upon as a proposed amendment to the charter.

7. This ordinance, which contains the only affirmative legislation requiring an enacting clause in a proposed amendment to the Medford charter, was enacted by the city council, under the authority of Article IV, Section 1a of the state Constitution, and it prescribes the method which shall be employed in the exercise of the initiative and referendum powers reserved to the legal voters of cities and towns. The council was empowered to enact the ordinance, and, therefore, if Section 14 was in force from the time of the filing of the initia-

tive petition for the Hanson Plan until the election, the charter amendment was not legally adopted: *State* v. *Kelsey,* 66 Or. 70 (133 Pac. 806). On the day before the election, however, the council passed ordinance No. 865, changing Section 14 of ordinance No. 124 and expressly declaring that "no enacting clause shall be necessary on measures enacted by the people." The same legislative authority that imposed the necessity for an enacting clause afterwards removed the necessity. If the council had power to legislate on the subject in the beginning, it likewise had power to change that legislation. When the initiative petition was filed an enacting clause was necessary, but when the people voted upon the measure an enacting clause was not necessary; and, if every notice necessary to confer jurisdiction was given and every formal step required was taken, it would be subordinating substance to form to say that the Hanson Plan was not legally adopted merely because the measure did not contain an enacting clause when the petition was filed. Had the measure itself been changed, quite a different question would be presented; but no alteration was made in the measure. It is admitted that the petition was signed by the requisite number of legal voters and, if it be assumed that all the jurisdictional formalities were observed, it necessarily follows that when the electors voted on the Hanson Plan they voted on a measure which a competent legislative authority had previously said did not need an enacting clause. All that occurred prior to the election was mere formality and preparation. The election was the vitalizing act and when that act occurred the measure itself was complete. The votes of the electorate operated upon a measure which contained all the formalities required by positive legislation.

8. Having concluded that the omission of the enacting clause did not violate any written law of the state or municipality, it yet remains to determine whether an enacting clause is essential in the absence of legislation prescribing it. In the *Seat of Government Case,* 1 Wash. Ter. 115, it was held that an enacting clause was necessary; but there was a vigorous dissenting opinion. In *Watson* v. *Corey,* 6 Utah, 150 (21 Pac. 1089), the court ruled that, in the absence of a statute, or Constitution requiring it, an enacting clause is not necessary; and the same conclusion is announced in *Ex parte Hudson,* 3 Okl. Cr. Rep. 393 (106 Pac. 540, 107 Pac. 735). Not only the number of judicial precedents but also the weight of reason supports the view that an enacting clause is not necessary when there is no Constitution, statute or other legislation requiring it. However, all possible doubt is removed in the instant case, for the reason that a competent legislative authority enacted a positive law dispensing with enacting clauses in measures enacted by the people.

9. Colby further contends that Section 3482, L. O. L., makes it unlawful to submit an initiative measure to the people within ninety days after the petition is first presented to the council. This section of the Code has no application to Medford. It is only one of the provisions of Chapter 226, Laws of 1907, providing for a method for the exercise of the initiative and referendum, and it does not apply to such cities and towns as have prescribed their own procedure. Article IV, Section 1a, empowers a city or town to provide for its own method of exercising the initiative and referendum; and when Medford enacted ordinances 124 and 125 a complete method was adopted in lieu of the method which is permitted but is not made compulsory by Chapter 226, Laws 1907. The petition was filed in

ample time to permit the publication and posting required by Section 9 of the ordinance; and, since it is not claimed that the prescribed notice was not given, it may be assumed that the recorder complied with the ordinance.

10. Although a competitive measure within the meaning of ordinance No. 124, the Hanson Plan was nevertheless legally submitted to the legal voters. Recurring to Section 1 of ordinance No. 124, as amended by ordinance No. 125, it will be observed that an amendment to the city charter may be *proposed:* (1) By the council (a) by ordinance or (b) by resolution; or (2) an amendment may be *proposed* by an initiative petition signed by not less than 15 per cent of the legal voters; and the *proposed* amendment is submitted to the voters "as hereinafter provided." Ordinances may be *proposed:* "By initiative petition signed by not less than fifteen (15) per cent of the legal voters of said city for approval or rejection, by order of the city council, approved by the mayor, or by referendum petition." Turning to Section 13 of ordinance No. 124, it will be seen that if an ordinance or an amendment to the charter is proposed by an initiative petition, the petition must be filed with the recorder who must then transmit it to the council. The council may then (1) ordain or (2) reject the measure or (3) do nothing. If the council rejects the proposed measure or takes no action for a period of thirty days, the measure must be submitted to the legal voters. The council may "ordain" the measure whether it be an ordinance or charter amendment, but the consequences may be different. The council may ordain an initiated ordinance without referring the ordained ordinance to the legal voters, because the council has the power to enact ordinances, subject of course to the right of the people to refer

85 Or.—33

the ordinance by a referendum petition.   However, the council does not have power to amend the charter; the council can only *propose* an amendment to the charter "by ordinance or resolution."   If the legal voters *propose* a charter amendment the council can (1) "ordain" or (2) reject such proposed amendment or (3) take no action; but in either event such proposed amendment must be submitted to the legal voters.   If the council ordains such proposed charter amendment, the action of the council only has the effect of a recommendation; and, hence, the measure goes to the legal voters with a favorable recommendation from the council; if the council rejects the measure, nevertheless the proposal must be submitted to the legal voters, but it goes to the people stamped with the disapproval of the council; and if the council takes no action at all the proposed amendment is submitted to the people without a direct expression of opinion by the council. Although the council cannot prevent a proposed charter amendment, initiated by a petition of legal voters, from being submitted to the electorate, it can either disapprove of or decline to express a direct opinion upon the measure, and then itself "ordain" and thus originate and propose an amendment to be submitted to the electorate in competition with the proposed amendment initiated by the legal voters; and when the two proposals are voted upon, the legal voters choose between the amendment *proposed* by the council and the one *proposed* by the signers of the initiative petition. Colby insists that none but the council can prepare and submit a competitive measure, and that the legal voters are prohibited from submitting a competitive measure by the filing of an initiative petition.   That part of Section 13 which refers to a limitation on the right to submit competitive measures applies only to competi-

tive measures prepared by the council. The section does not contain a line or a word directly or even inferentially prohibiting the legal voters from submitting a competitive measure.

11. Ordinance No. 124 as amended places no limitation upon the right of the legal voters to submit a competitive measure by an initiative petition. The Hanson Plan was not *proposed* by the council within the meaning of Sections 1 and 13; but it was *proposed* by the legal voters and in every sense of the term was a pure initiative measure originated by the legal voters in the exercise of the power of the initiative. It is true that the council caused the Hanson Plan to be prepared, but their interest and activity could not and did not change the manifest form and character of the petition after it had been signed by the required number of legal voters and properly filed as an initiative petition. Although the council caused the Hanson Plan to be prepared, the measure was attached to initiative petitions which were circulated and signed by the requisite number of voters and then filed as a pure initiative petition, and when the petition was filed it was an amendment *proposed* by initiative petition within the meaning of Section 1; and when the council subsequently ordained it that body merely exercised the power granted by Section 13 and recommended it to the favorable consideration of the voters. The Hanson Plan was *proposed* by the people and not by the council within the meaning of the law governing Medford.

Having determined that no rule of procedure was violated in the adoption of the Hanson Plan, we can now inquire into the validity of the measure itself. Throughout the investigation we must not lose sight of the fact that the Hanson Plan proposes to refund the indebtedness incurred for street improvements, sewers

and water-mains. Most of this indebtedness is represented by bonds and the remainder is presumably represented by city warrants. The bonds for street improvements and for sewers were issued on the authority of the Bancroft Bonding Act, while the bonds for water-mains were issued under the provisions of the city charter. Both Colby and Stailey own property which has been assessed for street paving. The assessment against the Colby property is payable in installments because the owner filed an application under the Bancroft Bonding Act; but the whole of the assessments against the Stailey property has been due for at least five years for the reason that the owner never filed any application under the Bancroft Bonding Act. Bonds have been issued because of the application to pay the Colby assessment in installments, but no bonds have been issued on account of the assessments against the Stailey property. The record does not disclose whether any assessments for water-mains have been levied upon any property owned by either Colby or Stailey; and, hence, it will be assumed that no water-main bonds have been issued on the faith of water-main assessments against property owned by either one of the plaintiffs.

On account of the questions arising out of the attack made on the Hanson Plan it will be convenient at this time to notice some of the material provisions of the Bancroft Bonding Act as well as some of the provisions of the charter relating to water-main assessments and bonds.

The Bancroft Bonding Act, as originally enacted and subsequently amended, is codified in Sections 3245 to 3253, L. O. L., inclusive. By the terms of Section 3245, L. O. L., whenever any city or town has improved a street or laid a sewer and has assessed the cost of

such improvement to the abutting property according
to the provisions of the charter of such city or town,

"it shall be lawful for the owner of any property so
assessed for such improvement or sewer in the sum of
$25 or more, at any time within ten days after notice
of such assessment is first published," to file with the
city "a written application to pay said assessment in
installments, and such written application shall state
that the said applicant and property owner does
thereby waive all irregularities or defects, jurisdic-
tional or otherwise, in the proceedings to improve the
street or lay the sewer for which said assessment is
levied and in the apportionment of the cost thereof.
Said application shall contain a provision that the said
applicant and property owner agrees to pay said as-
sessment in ten annual installments, with interest at
the same rate on all of said assessments which have
not been paid, as that expressed in the bond issued to
pay for such improvement."

No application shall be received if the amount of an
assessment against a lot with any previous assessment
for street improvements or sewers remaining unpaid
"shall equal or exceed the valuation of said property,
as shown by the last tax-roll of the county in which it
is situated." If, however, an assessment together with
previous assessments exceeds the valuation of the
property as shown by the last tax-roll of the county,
the owner may pay in cash the excess of the unpaid
assessments over the valuation of the property and
then file an application to pay the remainder in in-
stallments.

Section 3247, L. O. L., directs that after the expira-
tion of the time for filing applications for the right
to pay in installments, the city shall enter in a docket
kept for that purpose a description of the lot assessed
and the amount of the unpaid assessments and "such
docket shall stand thereafter as a lien docket as for

taxes assessed and levied in favor of such city," for the unpaid assessment with interest at 6 per cent per annum against the lot assessed until the assessment and interest are fully paid and "all unpaid assessments and interest shall be and remain a lien on each lot * * in favor of such city."

Section 3248 provides for the issuance of bonds and directs that when the lien docket is made up "such city shall by ordinance authorize the issue of its bonds in convenient denominations, not exceeding $500 each, and in all equal to the total amount of unpaid assessments," for which application to pay under the provisions of the act have been filed;

"and such bonds shall, by the terms thereof, mature in ten years from the date thereof, and be payable in gold coin of the United States, and bear interest not to exceed six per cent per annum, interest payable semi-annually, said interest to be evidenced by coupons attached to said bonds; provided, the right to take up and cancel such bond or bonds, upon the payment of the face value thereof, with accrued interest to the date of payment, at any semi-annual coupon period at or after one year from the date of such bond or bonds, shall be and hereby is vested in the city issuing such bond or bonds."

The bonds are signed by the mayor, president or other executive head of the city, countersigned by the auditor, clerk or other recording officer, and authenticated by the seal of the city. The words "improvement bond" with the name of the city issuing the bonds are inscribed or printed on the face of the bond. The bonds are then sold and the proceeds of the sale credited to the improvement fund for which the bond was issued and

"the accrued interest and premium accruing from the sale of said bonds shall be credited to the general fund

of said city, the fund from which interest is paid on street and sewer warrants, or to the improvement bond sinking fund,'' as the city shall direct.

Section 3249, L. O. L., prescribes that the assessment shall be divided into ten installments, one of which shall be paid each year with one year's interest ''on unpaid assessments or installments.'' Should the owner fail

''to pay the sum or sums aforesaid as the same shall become due * * then the same shall be collected in the same manner and with the same penalties as delinquent street or sewer assessments are collected in such city.''

Section 3253, L. O. L., prescribes that ''such city may redeem such bonds'' by giving ''notice of the readiness of such city to redeem'' by publication in a newspaper.

12. The Bancroft Bonding Act does not include bonds for water-mains. The water-main bonds depend for their validity upon an amendment to the charter which was adopted by the legal voters of the city in 1909. The charter authorizes the city to assess the cost of a water-main against the abutting property, and the assessment is collected in the same manner as assessments for street improvements. If a lot is assessed for $15 or more the owner can pay the assessment in ten installments by filing an application substantially like the one provided for by the Bancroft Bonding Act, and the subsequent steps required by the charter are practically the same as those prescribed by the Bancroft Bonding Act.

Having explained the procedure, purpose and scope of the Hanson Plan and having outlined the provisions of the Bancroft Bonding Act we can attempt to ascertain whether the Hanson Plan impairs the obligation

of any contract that may have been created by the
Bancroft Bonding Act. The argument advanced by
Colby is that a contract was created when the city
received the application bringing the assessment
against his property within the provisions of the Ban-
croft Bonding Act; and he argues that not only the
Bancroft Bonding Act but also all that part of the
city charter which at that time related to the collection
of delinquent street assessments was by force of law
written into and became a part of the contract. The
Bancroft Bonding Act prescribed the time and manner
in which the assessment should be paid while the city
charter provided the means and procedure for en-
forcing the collection of an assessment whenever it
became delinquent. Colby contends that the Hanson
Plan changes the amount of the installments, varies
the time in which payments are to be made, alters the
procedure for enforcing the collection of a delinquent
assessment, and adds penalties and burdens. The
Bancroft Bonding Act divides the original assessment
into ten installments and requires that one installment
with interest at 6 per cent per annum on the unpaid
installments shall be paid each year; but the Hanson
Plan treats the unpaid remainder as an integral, and,
after dividing it into ten installments, extends the time
of payment over a period of thirteen years; and if an
installment is paid in advance it shall be applied as
payment of the last maturing installment. The char-
ter provided that a delinquent assessment should be
collected by a sale of the assessed property "in the
manner provided by law for the sale of delinquent
state and county tax," and the owner "shall have the
right of redemption in the manner and with like pen-
alties as is provided by the general laws of the state
for redemption from tax sales." The Hanson Plan

imposes a penalty of 5% on an installment when it becomes delinquent, and the property is then sold ''for a sum sufficient to pay the delinquent and unpaid assessment thereon or installment thereof with interest, penalty and costs.''

The Hanson Plan permits the owner to redeem at any time within two years from the date of sale upon payment of the amount for which the property was sold with interest at the rate of 15% per annum together with all taxes and special assessments, interest, penalties, costs and other charges thereon paid by the purchaser of such property at or since such sale, with like interest thereon.  The charter refers to the ''law for the sale of delinquent state and county tax'' and to redemption ''as is provided by the general laws of the state for redemption from tax sales.''  These provisions of the charter were enacted in 1905.  The legislature enacted a statute in 1907 covering the subject of tax collection and this enactment was in turn liberally amended in 1913: Chapter 267, Laws 1907; Chapter 184, Laws 1913.  We need not determine the effect of the amendments of the state law, nor is it necessary to ascertain whether the Hanson Plan is different from the state law in the respects contended for by Colby, but it will be sufficient for the purposes of the instant case to assume, without deciding, that there is a difference between the method and penalties provided by the charter and the methods and penalties proposed by the Hanson Plan.  Colby also complains because the Hanson Plan attempts to provide for a suit for the foreclosure of a delinquent assessment; and he further objects to the Hanson Plan for the reason that the measure enables the city to purchase property at a delinquent assessment and to hold it for two years and thus reserve it from taxation for that period of time.

13–15. The federal Constitution prohibits a state from passing any law impairing the obligation of contracts: Article I, Section 10; and this prohibition applies to cities and towns when they amend their own charters, because they are but agencies of the state exercising legislative power which the state has delegated to them: *Straw* v. *Harris,* 54 Or. 424, 437 (103 Pac. 777). If the Hanson Plan impairs the obligation of any contract created by the Bancroft Bonding Act, then to that extent the Hanson Plan is void. The term ''contract'' is given its ordinary meaning, and, as used in the Constitution, means a voluntary agreement of minds, upon a sufficient consideration, to do or not to do certain things: *Ladd* v. *Portland,* 32 Or. 271, 274 (67 Am. St. Rep. 526, 51 Pac. 654). The obligation of a contract is defined as the law or duty which binds the parties to perform their agreement: *Walker* v. *Whitehead,* 16 Wall. 314 (21 L. Ed. 357); 6 R. C. L. 324; *Edwards* v. *Kearzey,* 96 U. S. 595, 600 (24 L. Ed. 793); and this depends upon the laws in existence when the contract is made: 8 Cyc. 931. If the duty to perform is lessened and either party is deprived of the benefit of his contract, the obligation of the contract is impaired. The obligation of a contract is impaired by the repeal of a law which constitutes a contract, or by a statute which alters the terms of the contract by imposing a new condition or which adds new duties: 6 R. C. L. 328. The established rule is that every contract embraces and includes all those laws which exist at the time and place where the contract is executed and where it is to be performed, and affect the validity, construction, discharge and enforcement of the contract: *Walker* v. *Whitehead,* 16 Wall. 314 (21 L. Ed. 357); *Edwards* v. *Kearzey,* 96 U. S. 595 (24 L. Ed. 793). In *Louisiana* v. *New Orleans,* 102 U. S. 203, 206 (26

L. Ed. 132), the Supreme Court of the United States said:

"The obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced,—by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy of these means impairs the obligation. If it tend to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened."

While the laws which afford the means by which a contract may be enforced, enter into and become a part of the contract, the state can nevertheless change the remedy, if the change does not impair any substantial right secured by the contract: *Walker* v. *Whitehead,* 16 Wall. 314 (21 L. Ed. 357). If the change still leaves a remedy and the new remedy is as substantial and efficacious as the remedy which existed when the contract was made, the obligations of a contract are not impaired: Cooley's Const. Lim. (5 ed.), 348; 8 Cyc. 999 In *Waggoner* v. *Flack,* 188 U. S. 595, 602 (47 L. Ed. 609, 23 Sup. Ct. Rep. 345), the court said:

"In the case of an alteration of a remedy, if one is left or provided which is fairly sufficient, the obligations of a contract are not impaired, although the remedies existing at the time it was entered into are taken away."

16. Under the terms of the charter a property owner is notified that an assessment has been made against his property; and if he does not pay the assessment within ten days from the service of notice, the city can enforce the payment by a sale of the property. The Bancroft Bonding Act interposes, however, and offers to the property owner the privilege of paying the assessment in installments. The property owner cannot accept this offer unless he agrees to waive all ir-

regularities or defects, jurisdictional or otherwise, in the proceedings relating to the improvement, the assessment, and the apportionment of the cost. The city agrees to permit the owner to pay his assessment in installments in consideration of the waiver; the owner agrees to waive irregularities and defects in consideration of the privilege of paying in installments; each party gives and each receives a consideration; and in the end the parties have made a contract. The obligation of the city is to permit the owner to pay in installments in the amounts and at the times prescribed by the Bancroft Bonding Act, and the obligation of the owner is to pay at the times and in the amounts specified. The city cannot by amendment to its charter change the terms of the contract without the consent of the owner. The Hanson Plan attempts to change the contract made between the city and owner by changing the number and amount of the unpaid installments and extending the time over a period of thirteen years. The right of the city to change the very substance of its contract does not depend upon whether the change is advantageous to the owner, but it is dependent upon the consent of the owner; and, hence, it is beside the mark to say that the change is for the benefit of the owner. The Hanson Plan is not merely permissive; it does not enable the owner to choose for himself; but its avowed purpose is to embrace all unpaid assessments by the compelling force of law; and, therefore, the Hanson Plan is unlawful to the extent that it attempts to change the contracts which it made under the Bancroft Bonding Act and also those made under the charter concerning water-main assessments.

17. The changes worked by the Hanson Plan and of which Colby complains may be grouped into three classes: (1) Those which affect the number and

amount of the installments and time of payment; (2) those which act upon the mode and method of enforcing the collection of delinquent assessments; and (3) those which deal with the consequences of delinquency. Thus far we have considered only such changes as belong to the first group, and it yet remains to determine whether the changes belonging to the second and third groups impair the obligation of any contract.

18. The contract embraces only those stipulations which the parties have by their own hands written into it or which the invisible but omnipresent hand of the law has written into it. When seeking to ascertain what the parties have by their own hands written into the contract, it must be remembered that although a special benefit assessment is to be differentiated from a pure tax, nevertheless the power to assess is embraced in and its exercise is a manifestation of the power of taxation; and, therefore, when an assessment is levied on abutting property for a street improvement it constitutes an exercise of sovereignty; and, hence, when it is alleged that any part of the sovereign power to tax has been surrendered by force of a contract, the agreement must be clearly manifested: *Ladd* v. *Portland,* 32 Or. 271, 276, 279 (67 Am. St. Rep. 526, 51 Pac. 654). The contract between the owner of the Colby property and the city only speaks of the waiver of irregularities, the amount and number of the installments and the time of payment. A special benefit assessment is a proceeding *in invitum* and is not based upon a contract: *Brewster* v. *City of Syracuse,* 19 N. Y. 117. The assessment is a forced charge imposed upon the property by the sovereign power of the state and its validity does not depend upon any theory of contract between

the property owner and the public: 1 Page and Jones on Tax. by Assess., § 15. The Bancroft Bonding Act is framed upon the theory that the improvement, the apportionment and levy of assessments, and the collection of delinquencies are all governed and controlled by the city charter. When the assessment is apportioned and levied, the property owner can prevent the city from enforcing the immediate payment of the whole assessment, by invoking the restraining hand of the Bancroft Bonding Act and thereby divide the assessment into installments and extend the time of payment over a period of ten years; but if the owner permits an installment to become delinquent, the restraining hand of the statute is removed and the city is free to employ its own processes for the collection of whatever may be due: *Ladd* v. *Gambell,* 35 Or. 393, 398 (59 Pac. 113). The contract between the owner and the city only embraces two subjects: (1) Payment; and (2) waiver. Obviously the agreement concerning the time and manner of payment does not include the mode of compelling payment or the consequences of delinquency. When the owner contracts with reference to the waiver he concedes that an assessment is already levied on his property and then agrees that he will not claim that it is an invalid assessment. Manifestly, the stipulation relative to the waiver does not also embrace a covenant relative to the mode of enforcing the collection of an assessment or the consequences of a delinquency. The parties have not by their own hands written into their contract any stipulations about the method of compelling payment or the consequences of delinquency.

It must be remembered that the instant case is to be distinguished from adjudications which deal with the right of contractors who have performed work or the

rights of the holders of bonds issued on account of improvements. Colby occupies the position of one who owns property charged with an assessment and the obligation imposed upon him is to pay. If he fails to perform the obligation, the city has a right to compel him to perform it, and, when the city invokes whatever method that may be provided for enforcing payment, it is only availing itself of its remedy. Laws prescribing the procedure and method for collecting delinquent assessments are not contracts and may, therefore, be modified so long at least as the substantial rights of the owner are not violated: 1 Page and Jones on Tax. by Assess., §§ 15, 167; *Spokane* v. *Browne,* 8 Wash. 317 (36 Pac. 26); *Bate* v. *Sheets,* 64 Ind. 209, 212; 2 Page and Jones on Tax. by Assess., § 1113; *Essex Public Road Board* v. *Skinkle,* 140 U. S. 334, 340 (35 L. Ed. 446, 11 Sup. Ct. Rep. 790). In 1 Page and Jones on Tax. by Assess., § 170, we find this language:

"A property owner has no contractual right in the consequences which, by law, follow in case of his delinquency. Such consequences may therefore be changed by law, without impairing the obligation of contracts."

19. A contract had been let at a time when interest could not be charged on assessments, but before the assessment was levied the statute was modified so as to permit interest on assessments and it was held in *Dougherty* v. *Henarie,* 47 Cal. 9, that if the owner neglected to pay his assessment when it became due there was no constitutional objection to a statute charging interest after the assessment matured. In passing, it may be noted that when interest is charged on a delinquent tax it is not regarded as interest in the sense that it is a consideration for

the forbearance of money, but it is deemed to be a penalty; and when interest, so called, is charged, it is sustained on the theory that it is a means to insure prompt payment of the tax and it is not a part of the tax: *State* v. *Superior Court,* 93 Wash. 433 (161 Pac. 77). An assessment was levied at a time when the statute contained no provision for attorney's fee in case suit should be brought to enforce payment of the assessment. Afterwards a statute was passed allowing an attorney's fee as a part of the costs of suit and the court held, in *Dowell* v. *Talbot Paving Co.,* 138 Ind. 675 (38 N. E. 389), that the amendatory statute did not violate the obligations of any contract. The city has a right to change the remedy for the collection of delinquent assessments, and not even a contractor who has agreed to look to the assessments for his compensation can complain so long as the new is as efficacious as the old remedy, and much less can a property owner complain. Even though the owner is viewed as a party to a contract which creates a debt by assessment and provides for the time and amount to be paid, he nevertheless could not object to a more efficacious method of compelling him to do what he agreed to do, for as said by the Supreme Court of the United States in *New Orleans City & Lake R. R. Co.* v. *Louisiana ex rel. New Orleans,* 157 U. S. 219, 224 (39 L. Ed. 697, 15 Sup. Ct. Rep. 581):

"Modes of procedure in the courts of a state are so far within its control that a particular remedy existing at the time of the making of a contract may be abrogated altogether without impairing the obligation of the contract if another and equally adequate remedy for the enforcement of that obligation remains or is substituted for the one taken away. * * One who engages by contract to do a certain thing cannot claim that the obligation he has assumed is impaired by

legislation that is designed only to enforce performance of his obligation.''

The law did not write into the contract between the owner of the Colby property and the city a stipulation that a delinquent assessment could only be collected in the mode provided at the time the contract was made; nor did the law insert a covenant that the consequences of delinquency could not be changed; and, since the parties themselves did not contract about the mode of enforcing collections or concerning the consequences of delinquency and since the law did not introduce into the contract any stipulation upon those subjects, it necessarily follows that the contract clause of the Federal Constitution is not violated by the mere fact that the Hanson Plan provides for a different procedure or imposes new and added penalties. The procedure attempted to be provided for by the Hanson Plan contains some features which probably cannot be sustained on account of the fact that the power of the legal voters of Medford is limited to the enactment and amendment of their municipal charter and to the enactment of ''local, special and *municipal* legislation.'' It will not be necessary to point out those objectionable features since they will become manifest upon the application of the doctrines announced in *West Linn* v. *Tufts,* 75 Or. 304 (146 Pac. 986); *State* v. *Port of Astoria,* 79 Or. 1 (154 Pac. 399); and *Rose* v. *Port of Portland,* 82 Or. 541 (162 Pac. 498).

20. The contention that Colby will be injured, if, at the sale of land for delinquent assessments, property is struck off to the city when there is no better offer to pay the full amount due, may be dismissed with the statement that it is competent to authorize a municipality to purchase in the absence of bidders, even

85 Or.—34

though the legislation conferring the authority is enacted after the assessment is made and before the sale: 2 Page and Jones on Tax. by Assess., § 1179; *City of New Whatcom* v. *Bellingham Bay Imp. Co.,* 16 Wash. 131 (47 Pac. 236); *Sutphin* v. *City of Trenton,* 31 N. J. Eq. 468.

21. The next contention made by Colby is that the levy of taxes for the purpose of paying interest on bonds in 1914, 1915 and 1916, and the payment of the taxes by the property owners, created a contract which obligates the city to waive the liens on property charged with special benefit assessments and to pay the entire indebtedness by general taxation. The right to tax does not grow out of nor does it depend upon a contract between the property owner and the state or its agency; and, hence, it cannot be successfully contended that the levy and collection of taxes for the purpose of paying interest in those three years created a contract. The special benefit assessments were not founded upon a contract, but they are referable to the power to tax and the levies made in 1914, 1915 and 1916, are likewise referable to the sovereign power of taxation.

22, 23. Proceeding with his contention, Colby insists that even though a contract was not created by the levy of taxes for the payment of interest on bonds, nevertheless it will be inequitable to enforce the collection of assessments, and that the city should therefore be obliged to pay the whole of the indebtedness by general taxation. The bonds issued under the Bancroft Bonding Act are general obligations of the city. There is no provision in the statute limiting the payment of the bonds to funds derived from special benefit assessments; but, on the contrary, a reading of the Bancroft Bonding Act makes it plain that the statute

contemplates that the bonds shall be regarded as liabilities of the city and that the city is obligated to pay the full amount of every bond without regard to whether the assessments have been or can be collected: *United States* v. *Fort Scott,* 99 U. S. 152 (25 L. Ed. 348). See also: *Mall* v. *Portland,* 35 Or. 89, 95 (56 Pac. 654); and *Stratton* v. *Oregon City,* 35 Or. 409, 415 (60 Pac. 905). It is true that the city did not attempt to enforce the collection of any assessments by selling the assessed property, but it is also true that according to the admitted facts the city could not have sold all the delinquent property for enough to satisfy the full amount of the delinquencies. The plaintiffs say in their printed brief that

"At least one third of the total cost of the pavement throughout said city will never be paid by the owners of the property before which such paving is laid, they preferring to forfeit to the city their property in all instances where said property is of less value than the cost of such improvement."

Laying aside the pessimistic views taken by the plaintiffs, it nevertheless plainly appears from the admitted facts that to have sold delinquent property in 1914, 1915 and 1916, would merely have postponed the necessity of resorting to general taxation, because it is conceded that a deficit will remain after the property of non-paying owners is sold for delinquent assessments and sooner or later this deficit must be satisfied with funds derived from general taxation. The plaintiffs do not claim that the charter does not confer the power of taxation upon the city, but every contention made by them proceeds upon the theory that the city has power to levy a general tax. As between the city and the holders of the Bancroft bonds, the bonds constituted obligations of the city, and when the city levied a general tax to pay

the interest on the outstanding bonds it did what in the very nature of things at some time would have been not only a right, but a duty, namely, the levy of a general tax to pay the debts of the city: Abbott on Public Securities, §§ 363, 364, 365 and 366. It is not necessary to decide whether the city could have been compelled to sell delinquent property before levying a general tax, for it is sufficient to say that the tax was levied and collected without any attempt to prevent it, and the property owners cannot now compel the city to waive its liens and pay all its indebtedness by general taxation. It would be an anomaly to say that the conduct of the municipal authorities constituted an election to waive the liens of special assessments when by levying a tax it merely did what it could be compelled to do after the liens are exhausted by full payment on the part of paying owners and partial payment by enforced sales of the property of nonpaying owners: Abbott on Public Securities, § 370.

24. Colby tendered the principal of the installment due on his property in 1914, but he refused to pay the interest on the theory that he had paid the interest by paying his taxes.

Taxes were levied on all taxable property in Medford, and out of these taxes the city paid the interest due on the outstanding bonds. It is true that when Colby paid his taxes the city used the money for the payment of interest due on bonds which the city had issued on account of the Colby assessment and also for the payment of interest due on bonds which the city had issued on account of assessments against the property of other persons; but it is also true that persons who had paid their assessments in full as well as owners of property which had never been charged with any local assessments were required to pay their

taxes and these taxes were used to pay the interest due on bonds, including the bonds which were issued on account of the Colby assessment. An owner whose property had never been charged with a local assessment could not have defeated the tax: *Durrett* v. *Davidson,* 122 Ky. 851 (93 S. W. 25, 8 L. R. A. (N. S.) 546) ; nor could the owner of property on Grape Street have avoided paying the tax by showing that he had fully paid the street assessment levied against his own property. Payment of the tax was not payment of any part of the assessment. When Colby paid his taxes he did exactly what every other property owner did. It might appear at first blush to be inequitable to require Colby to pay the tax and also the interest on the assessment, but upon further consideration it will become manifest that his position is not greatly different from the position of the owner of property on Grape Street who was obliged to pay his taxes notwithstanding the fact that he had already made full payment of the assessment levied against his property; and, moreover, it must be remembered that taxes were collected from every property owner in Medford and that consequently taxes collected from persons who owned property which had never been charged with a local assessment were used to pay interest on bonds, including the bonds issued on the Colby assessment. To relieve Colby from paying interest on his assessment would be to extend to him a favor not accorded to those who have paid both their taxes and their assessment. There are no equities exempting Colby from the payment of interest on his assessment.

25, 26. We have thus far considered and disposed of all the objections which Colby has urged against the Hanson Plan. There is yet another objection which must be noticed because it is necessarily in-

volved in this suit. The Bancroft Bonding Act
was passed by the legislative assembly and it is a
statute of state-wide application, for it embraces
every city and town in the state. The amendments
found in Article IV, Section 1a, and Article XI,
Section 2, of the Constitution have not shorn the
legislature of power to enact general laws concern-
ing cities and towns: *Rose* v. *Port of Portland*, 82
Or. 541 (162 Pac. 498). Although passed prior to
these two constitutional amendments, the Bancroft
Bonding Act possesses just as much validity now as it
did when originally enacted, for it governs, controls and
dominates every incorporated city and town in Ore-
gon. When a property owner brings himself within
the Bancroft Bonding Act he puts into operation a
state law which completely controls the city so long
as the owner promptly pays his installments and in-
terest. The city is utterly powerless to enact and
enforce municipal legislation which overrides this state
law. The Bancroft Bonding Act does not compel any
owner to come within its embrace, but it merely holds
out an offer which an owner may accept or decline as
he chooses. The city can legislate concurrently on the
same subject provided its legislation does not attempt
to compel owners to come within its embrace. To illus-
trate: By the terms of the Bancroft Bonding Act the
state offers to property owners a plan by which they
may postpone the payment of assessments; the city can
also devise and offer a plan for payment by install-
ments to be accepted by the owner if he chooses, but
the city cannot compel the owner to accept its plan,
because the state law permits the owner, if he wishes,
to accept the plan offered by the state. Again, the city
can enact municipal legislation providing for a plan
by which owners now within the Bancroft Bonding Act

may, if they choose, relinquish their rights under the state law and come within the embrace of the municipal plan; but the city is utterly powerless to compel a change. In its present form the Hanson Plan attempts by force of law to bring all assessed property within its embrace and it is therefore void to the extent that it attempts to operate upon property which has been brought under the protection of the Bancroft Bonding Act.

Our conclusions thus far expressed concerning the Hanson Plan may be summarized thus: As against applicants under the Bancroft Bonding Act and also as against applicants under the water-main provisions of the charter the Hanson Plan cannot be sustained because it attempts compulsorily to change the contract between the city and owners relative to the number and amount of installments and the time of payment; as against applicants under the Bancroft Bonding Act the Hanson Plan is void, because the attempted municipal legislation conflicts with the state legislation; but neither the contract nor the state law would be violated if the Hanson Plan were permissive instead of compulsory.

27. Stailey confines his complaint to an attack upon (1) the proceedings for the improvement of Grape Street and (2) the assessment proceedings. The charter of Medford authorized and empowered the council "to improve any street"; no improvement could be undertaken without posting and publishing notice for ten days of the intention of the council to order the improvement; after hearing all protests the council could

"notwithstanding said protests, if it deems the improvement of material benefit to the city, proceed to ascertain and determine the probable cost of making

such improvement, and assess upon each lot or part thereof adjacent to said improvement its proportionate share of the cost of said improvement.''

The council had ''full control of all streets'' and could ''order and prescribe the kind and character of all improvements'' and could ''prescribe the width'' of the improvement ''and the mode of construction'' and could ''compel the owners of the property abutting thereon or benefited thereby to pay the cost of such construction, improvement and repair, in such manner as the said council shall deem for the best interest of said city.'' The charter under which Medford was acting from 1907 to 1913 lacked many of the restrictions which are usually found in municipal charters. The power of the council was not dependent upon a petition of property owners; but the council acquired the right to pave a street by declaring its intention and by posting and publishing notice of its intention. Property owners had the privilege of protesting; but if the council deemed the proposed improvement of material benefit to the city it could make the improvement and assess the cost to the abutting owners ''notwithstanding said protests.'' We have not discovered nor has our attention been called to a single provision in the charter requiring the council to give notice to bidders. The city was prohibited from entering into any contract except by ordinance, but this was the only express limitation upon the power of the council to contract; and, hence, after jurisdiction was acquired by adopting a resolution of intention and giving the required notice of intention to order an improvement, the council became vested with practically unlimited power to contract for the improvement.

On February 15, 1910, the council adopted a resolution to pave Grape Street from Sixth Street to Eighth

Street.   Notice of this resolution was published but there is no proof of posting.   On April 8, 1910, the council passed an ordinance authorizing a contract for the improvement of Grape Street from Sixth Street to Eighth Street to be made with the Clark & Henry Construction Company, and afterwards this contract was amended by an ordinance which was passed on July 19, 1910.

On February 23, 1910, a petition was filed asking that Grape Street be paved from Eighth Street south to the city limits.   On March 3, 1910, a resolution of intention to pave Grape Street from Eighth Street south to the city limits was adopted and notices were posted and published.   Subsequently on July 8, 1910, a second resolution of intention to improve was adopted, and while notice of this resolution was posted, there is no proof of its publication in any newspaper.   On August 2, 1910, the council by ordinance authorized a contract for the improvement of Grape Street from Eighth Street to South City limits to be entered into with the Clark & Henry Construction Company.

On February 21, 1911, the council adopted a resolution of intention to pave Grape Street from Sixth Street to South City limits.   There was both a posting and publication of notice that the council intended to order the improvement and that it would meet on March 7, 1911, at 7:30 P. M. and that all protests would be heard at that time.   The council met on March 7, pursuant to notice, and after transacting some business adjourned to meet on March 8, 1911.   The council met pursuant to adjournment and adopted a resolution ordering the improvement of Grape Street from Sixth Street to South City limits.   On August 16,

1911, the council passed an ordinance which recites that the council

"finds that the special and peculiar benefit accruing upon each lot or part thereof adjacent to said improvement and in just proportion to benefits, to be the respective amounts hereinafter set opposite the number or description of each lot or part thereof, and such amounts respectively are hereby declared to be the proportionate share of each lot or part thereof, of the cost of such improvement. * * *"

The Stailey property is included in this assessment ordinance.

The resolution of February 21, 1911, included all that part of Grape Street which was covered: (1) By the prior resolution of intention to pave from Sixth to Eighth; and (2) by the two prior resolutions of intention to pave from Eighth Street south to the city limits. Presumably the improvement was made by the Clark & Henry Construction Company on the faith of the two contracts which they had made under the two ordinances authorizing the city to contract for a pavement from Sixth Street to Eighth Street and from Eighth Street south to the city limits, for there is no affirmative statement that no other contract was made. The record does not disclose whether the work was actually done before or after the adoption of the last resolution. The resolution of February 21, 1911, was followed by the requisite posting and publication of notice and the council acquired full power to make the improvement from Sixth Street south to the city limits. The resolution of March 3, 1910, was also followed by the requisite posting and publication of notice and authorized the council to improve South Grape Street from Eighth Street south to the city limits; and even though the resolution of July 8, 1910, concerning that

part of South Grape Street lying between Eighth Street and the city limits was defective and even though the resolution of February 15, 1910, relating to the portion of Grape Street between Sixth and Eighth Streets was also defective, these two defective resolutions cannot invalidate the improvement and assessment proceedings when it appears from the record that by one resolution the council acquired jurisdiction to improve from Eighth Street south to the city limits and by another resolution acquired full power to improve from Sixth Street south to the city limits, when it appears that the work was actually done and the assessment made without any protest on the part of Stailey and when it further appears that he is chargeable with laches because he waited six years before protesting or attempting to defeat the assessment.

28. The objection that the resolution of February 21, 1911, was adopted without a petition signed by property owners comes to naught when it is remembered that the charter empowers the council to act without a petition.

Complaint is made because the record of the council meeting of March 7, 1911, does not disclose whether any protest was filed against the improvement. Although the council had ample power to order the improvement in despite of any remonstrance that may have been filed it will be assumed that the record must contain some recital showing whether a remonstrance was filed. The resolution of March 8, 1911, ordering the improvement of Grape Street from Sixth Street south to the city limits, refers to the resolution of intention and the giving of notice and then recites "whereas no protests were received against the same. * * * " This affirmative finding is sufficient,

especially after a delay of six years. Again, the assessment ordinance of August 16, 1911, recites that:

"No protests having been filed against the improvement of Grape Street from Sixth Street to South City limits, due notice of the intention of the council to cause said improvement to be made having been given and said improvement having been ordered made. * * "

29. Stailey insists that the assessment should be annulled because the city permitted many owners to bring their property within the Bancroft Bonding Act when the actual value of their property was less than the amount of their assessment; but the answer to this objection is that the right to pay in installments depends upon whether the amount of the special benefit assessment is less than the valuation "as shown by the last tax-roll of the county," and it is conceded that every lot was valued on the tax-roll for more than the special benefit assessment levied against it.

30. It is now too late to object to the amount of the assessment against the Stailey property. The council levied the assessment after first finding "that the special and peculiar benefit accruing upon each lot * * and in just proportion to benefits" to be the amount so assessed. There is no charge of fraud. Stailey admits that his property has received some benefit from the improvement; and this admission coupled with the fact that there is no charge of fraud renders the finding of the council conclusive in this suit: *Paulson v. Portland,* 16 Or. 450, 460 (19 Pac. 450, 1 L. R. A. 673); *Masters v. Portland,* 24 Or. 161, 165 (33 Pac. 540); *Oregon & Cal. R. R. Co. v. Portland,* 25 Or. 229, 238 (35 Pac. 452, 22 L. R. A. 713); *Duniway v. Portland,* 47 Or. 103, 112 (81 Pac. 945); *Hughes v. Portland,* 53 Or. 370, 385 (100 Pac. 942); *Houck v. Roseburg,* 56 Or. 238, 244 (108 Pac. 186).

31. The decision of this court in *King* v. *Portland,* 38 Or. 402 (63 Pac. 2, 55 L. R. A. 812), affirmed by the United States Supreme Court in 184 U. S. 61 (46 L. Ed. 431, 22 Sup. Ct. Rep. 290), forecloses debate about the validity of the front-foot rule of assessment.

32. Another contention arises out of the fact that the cost of the street intersections was included in the assessment for the Grape Street improvement while the expense of paving the intersections in the Main Street and Oakdale Avenue improvements was paid by general taxation, with the result that owners of the property abutting on Grape Street paid all the expenses of paving the intersections in that street and at the same time helped to pay for the intersections in Main Street and Oakdale Avenue. The council had the power of exercising its discretion as to whether it would include or exclude the cost of street intersections when making the assessment; and when the council possesses this discretionary power it will not be prevented from levying special assessments for an improvement even though it has in the past paid for the same kind of improvement by general taxation: *Ladd* v. *Gambell,* 35 Or. 393, 400 (59 Pac. 113); *McChesney* v. *Chicago,* 152 Ill. 543 (38 N. E. 767); 1 Page and Jones on Tax. by Assess., §§ 236, 239, 317 and 440; 2 Page and Jones on Tax. by Assess., § 716. See also: *Durrett* v. *Davidson,* 122 Ky. 851 (93 S. W. 25, 8 L. R. A. (N. S.) 546).

The printed brief for the plaintiffs suggests several other objections, but it is sufficient to say that we have examined them and conclude that they are without merit. Stailey is not entitled to a cancellation of the assessments levied upon his property.

Although it may be assumed that the Hanson Plan would not violate any rights of owners who are neither within the protection of the Bancroft Bonding Act nor

within the protection of the city charter provisions concerning water-mains, yet the assessments which are protected by the charter and the Bancroft Bonding Act constitute such a large part of the total amount covered by the Hanson Plan and so materially enter into the very framework and purpose of the plan itself as to destroy the whole measure.

The Circuit Court correctly decreed that the proceedings for the improvement of Grape Street and for the assessment of the cost of the improvement were unassailable, and that the assessment against the Stailey property was a valid charge; and, therefore, this part of the decree is affirmed; but, for the reasons already stated, it was error to hold that the Hanson Plan was a valid amendment to the city charter, and consequently this part of the decree is reversed. The city is entitled to a judgment against Stailey for costs and disbursements while Colby is entitled to a judgment against the city for his costs and disbursements.

MODIFIED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BENSON and MR. JUSTICE BURNETT concur.