Argued July 7, reargued December 6, 1960, reversed January 11,
petition for rehearing denied January 31, 1961

## BECHTELL ET AL *v.* CITY OF SALEM ET AL

358 P. 2d 563

*Chris J. Kowitz* and *William J. Juza,* Salem, argued the cause and filed briefs for appellants.

*Harold W. Adams, Jr.,* Lebanon, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

SLOAN, J.

Defendant city appeals from a decree which declared void special assessments against the property of plaintiffs for street and sidewalk improvements. The trial court found certain irregularities in the as-

sessment proceedings and declared the entire assessment void. The irregularities complained of relate to allocation of costs and accounting procedures. Plaintiffs insist that the decree be affirmed. We think the first and decisive question is the standing of plaintiffs to seek judicial restraint of the assessment. To reach decision on that question it is necessary to first consider the chronology of the events which led to the special assessments.

On June 3, 1952, a petition was filed with defendant city which requested the improvement of a portion of Judson Street in Salem. The petition was signed by a sufficient number of persons to require the attention of the city council. No challenge is directed at the form or substance of the petition.

The city council did not act on this petition until March 23, 1953. The reason for the delay in passing upon the petition is not disclosed. The delay is not material except that it is important to notice that the petition was pending before the council for the several months indicated.

On March 23, 1953, the council adopted a resolution which declared the city's intent to make the improvement petitioned for at the expense of the adjacent and abutting owners. The resolution provided for public notice to be given as required by the city charter. Notice was published. The notice informed all interested persons that plans and specifications for the proposed improvement were on file at the office of the city recorder; that the costs would be borne by adjacent and abutting property owners, and that written remonstrances could be filed with the city recorder within ten days from the date of final publication of the notice. The notice was published for two weeks. The plans and specifications filed included estimated

costs. Consequently, and this, too, is important, there is and could be no question of the jurisdiction of the city council to make the improvement and to thereafter impose the challenged special assessments.

The improvement work was completed during the summer of 1953. After completion, the city engineer prepared a schedule of the costs of the improvement. The actual cost was about $4500 less than the estimated cost. The engineer also determined the apportionment of cost to the property benefited. This schedule of costs and the apportionment thereof was submitted to the city council by ordinance. The ordinance was considered by the council on first reading on October 29, 1953. It was presented for second reading and approved on November 9, 1953. Five plaintiffs paid the assessment in full, one of them by protest. The other plaintiffs made application to pay by installments. The decree required the city to repay these payments made by all plaintiffs with interest.

We have detailed the chronology leading to the approval of this assessment ordinance to emphasize the salient fact of this case: From the time the petition was first filed until after the special assessment ordinance was approved on November 9, 1953, no objection to the improvement or to the assessments was made to the council by anyone. By a letter dated November 19, 1953, one of the property owners who is now a plaintiff objected to some of the items of cost included in the assessments. He also paid the special assessment against his property in full, but under protest. This was the first objection made to the city, either as to the improvement or to the costs incurred.

Other correspondence between this particular plaintiff and the city officials followed. The city council caused some re-examination of the allocation of costs

to the particular project to be made by the city engineer and the city attorney. The city council eventually declined to make any change in the special assessments and this declaratory proceeding followed.

In their complaint plaintiffs asked that the special assessments be declared void or, in the alternative, that some of the items charged to the improvement by the city be eliminated and the city required to reassess the property. The trial court declared the entire assessment to be void. We cannot sustain the trial court's decree.

The city council acquired jurisdiction to act. The plaintiffs' allegation of fraud is without any foundation of fact. The validity of the procedural requirements of the city charter and ordinance was not questioned. Only certain irregularities in the amount of and accounting for costs is charged. There was no "plain and indisputable" evidence that the council had exceeded its authority. *Austin v. Tillamook City,* 1921, 121 Or 385, 395, 254 P 819. Nor was there evidence of a similar character that the respective properties of the plaintiffs had not been benefited to the extent found by the council. *Hughes v. City of Portland,* 1909, 53 Or 370, 100 P 942.

The foundation of plaintiffs' case is an old ordinance of the city which required antiquated accounting methods to record costs of a special improvement. In short, the ordinance would have required separate records, bills and warrants for every sack of cement, keg of nails or load of asphalt delivered to this particular job. The city had not literally followed the letter of this ordinance for many years. Instead, it had adopted methods of large scale purchase and the allocation of costs thereof to its numerous projects on a basis of cost per unit or similar recognized means

of cost accounting. The method used was obviously more efficient and less costly to the taxpayers. The same was true of other items of expense complained of. It was said that the cost for the use of equipment was not specially accounted for in separate detailed records. The city used the method commonly practiced by most large concerns using heavy equipment; an established cost per hour was charged. There is no reason to examine every one of the accounting practices complained of. The method of accounting and allocation of costs was the source of most of the debate in the trial court. Our disposition of the case makes it unnecessary to decide if the ordinance in question required strict compliance with its terms.

The above also appears to be the cause of the argument that the city's accounting records of the cost of the improvement were so poor that even if a property owner had examined the records prior to the approval of the assessment ordinance on November 9, 1953, he could not have learned of the items of cost to be included in the assessment. As before mentioned, the city council first considered the assessment ordinance on October 29, 1953. From that date on, at least, the total cost records were available. There is nothing in the record to indicate that the accounting records have been changed, altered or expanded since that date. Any plaintiff could have been as fully informed as to the nature of the costs allocated to this improvement prior to November 9, 1953, as he could have been when the complaint herein was filed.

■ It must be conceded that it would have been preferable procedure if the Salem charter had required notice to be given that the city council would consider the assessments on a given date. It was not contended, however, that the failure of the charter to require a

notice, other than the initial notice of an intent to make the improvement, would void the proceedings. The one notice was enough. *Paulsen v. City of Portland,* 1893, 149 US 30, 13 S Ct 750, 37 L Ed 637: *Wilson v. City of Salem,* 1893, 24 Or 505, 34 P 9, 691.

> "* * * Having been notified of the inception of the assessment proceedings, and of the hearing before the bureau of compensation, the plaintiff became chargeable with notice of the entire proceedings from the time of the reference to the board of compensation for the purpose of ascertaining benefits and damages, to the time the report of the department of public works was finally accepted and ordered to be recorded. The entire matter was, in contemplation of law, one proceeding, of each step in which the plaintiff was not entitled to receive a new notice, in order to render the proceedings valid, unless such new notice was required by the provisions of the charter. *Fair Haven & W. R. Co. v. New Haven,* 75 Conn. 442, 454, 53 Atl. 960; *Gilbert v. New Haven,* 39 Conn. 467, 472." *Katsch v. New Haven,* 1912, 86 Conn 326, 333-4, 85 Atl 523, 525-6.

In *Heitkemper v. Schmeer et al,* 1929, 130 Or 644, at p 659, 275 P 55, 281 P 169, this court quoted with approval. " 'Wilful ignorance is equivalent, in law, to actual knowledge. One who abstains from inquiry when inquiry ought to be made cannot be heard to say so, and to rely upon his ignorance.' " At page 665 the court also quoted with approval: " 'The general rule that pervades the whole doctrine of notice is that, whenever sufficient facts exist to put a person of common prudence upon inquiry, he is charged with constructive notice of everything to which that inquiry, if prosecuted with proper diligence, would have led.' "

■ In short, then, before the date any plaintiff either paid the assessment in full or signed an installment application, each of them was charged with legal

knowledge of the cost items included in the assessment. Not one plaintiff testified that he had attempted to inquire and had been refused or unable to learn from the records. In fact, not one plaintiff testified that he had inquired at all. There is nothing in the record before us to justify the failure of plaintiffs to attempt to acquire knowledge by inquiry.

The fact of legal knowledge is important, therefore, as we turn to a consideration of the standing of plaintiffs to maintain this proceeding. In doing so it is necessary to consider first the standing of those plaintiffs who filed application to pay the assessment by installment payments. Second, the standing of those plaintiffs who paid in full. As indicated, one of the latter accompanied his payment with a letter of protest. It will later appear that the protest did not create any additional rights in that one plaintiff.

■ The statute, commonly referred to as the Bancroft Act, codified as ORS 223.205 et seq., provides that the owner of property subject to a special assessment may make application to pay the amount of the assessment in installments. ORS 223.215 provides that the "written application shall state that the applicant and property owner does thereby waive all irregularities or defects, jurisdictional or otherwise, in the proceedings to cause said improvement to be constructed or made for which the assessment is levied  *  *  *." Subject to certain limitations not pertinent to this case, the city must accept and allow the application when it conforms to the statute just quoted. The applications made by plaintiffs in this proceeding contained that provision of waiver.

The court has held without qualification that such an application forms a contract between the city and the property owner and that the assessed property

owner may not thereafter judicially challenge the assessment. *Fehl et al v. City of Medford et al,* 1923, 107 Or 478, 483, 215 P 180; *Wagoner v. City of La Grande,* 1918, 89 Or 192, 208, 173 P 305; *Colby v. City of Medford,* 1917, 85 Or 485, 526, 167 P 487; *Parker v. Hood River,* 1916, 81 Or 707, 710, 160 P 1158, and much more recently in *Paget v. City of Pendleton,* 1959, 219 Or 253, 346 P2d 1111.

It is said that there was no evidence that any of the plaintiffs had signed Bancroft applications. The answer filed by the city alleged the execution of the applications by certain of the plaintiffs and the pertinent provisions of such applications. Those allegations were not denied by plaintiffs' reply.

It was also argued that the city's position was not changed by accepting these applications and, therefore, no estoppel was involved. It was not a question of estoppel; the applications created a binding contract of waiver fortified by adequate consideration. *Fehl et al v. City of Medford,* supra. In *Colby v. City of Medford,* supra, 85 Or at p 523-4, the court said:

> "Under the terms of the charter a property owner is notified that an assessment has been made against his property; and if he does not pay the assessment within ten days from the service of notice, the city can enforce the payment by a sale of the property. The Bancroft Bonding Act interposes, however, and offers to the property owner the privilege of paying the assessment in installments. The property owner cannot accept this offer unless he agrees to waive all irregularities or defects, jurisdictional or otherwise, in the proceedings relating to the improvement, the assessment, and the apportionment of the cost. The city agrees to permit the owner to pay his assessment in installments in consideration of the waiver; the owner agrees to waive irregularities and defects in con-

sideration of the privilege of paying in installments; each party gives and each receives a consideration; and in the end the parties have made a contract. * * *"

In *Paget v. City of Pendleton,* supra, 219 Or at p 262, we held that "an agreement by the property owners waiving their right to protest the assessment is binding upon them and their successors in interest with notice. [Citing cases and other authority.]"

■ In respect to those plaintiffs who paid in full, one by protest, we are governed by a decision of this court in *Johnson v. Crook County,* 1909, 53 Or 329, 333, 100 P 294.

"We believe that reason supports the rule that when a tax has been paid without compulsion, but with comprehension of its invalidity, or with means of knowledge of its illegality, the liquidation is voluntary and prevents a recovery of the money disbursed, although the payment may have been made under protest. * * *"

Again, at pages 335-336:

"It will be remembered that the complaint herein avers that the sheriff of Crook County, obeying the command of the warrant attached to the roll, notified the plaintiff that his land was taxed to the extent of $364.57, informed him that the exaction was just and due, and that unless the sum was paid he would 'in due time' collect it by a sale of the property. It is nowhere alleged that the sheriff was either in the act of selling the land, or that he threatened immediately to do so; or that plaintiff, believing that the menace would be instantly executed, was by the abrupt urgency insnared into meeting the payment, or that he had no other expedient of freeing his property from the lien which the levy of the tax created."

*Johnson v. Crook County* has been cited and followed in *First National Bank v. Benton County*, 1944, 175 Or 485, 494, 154 P2d 841. We are not disposed to overrule *Johnson v. Crook County*.

■ There was one item of cost included in the assessment which requires different consideration. It was the cost of sidewalks within the street and alley intersections. The record is far from clear as to the extent that sidewalks were constructed within the intersections. The record does show that some intersection sidewalks were built and the cost apparently assessed against the abutting owners. The notice originally given which informed the property owners of the proposed improvement specified that the cost of street and alley intersections would be paid by the city and not charged against the abutting owners. It would have been proper from the notice given for the owners to expect that this cost included the sidewalks in the intersections. Because of this, the abutting owners would have been justified in assuming that they had not been assessed for the intersection sidewalks at the time payment was made or application filed. Therefore, to the extent that street and alley intersections were assessed against abutting property owners the assessment would have been invalid. The amounts so improperly assessed should be removed from the assessment and the amount thereof reimbursed or credited on the unpaid installments, as the case may be.

The decree is reversed with directions to remand the case to the city council to proceed in conformity with this opinion. Costs to neither party.

ROSSMAN, J., dissenting.

Notwithstanding the fact that the City of Salem included in the bonding applications, which it required

applicants for Bancroft bonding (ORS 223.205 through 223.300) to sign, a provision (1) which is absent from the form of applications for bonding prescribed by ORS 223.215 and (2) which is hostile to the provisions of the Bancroft Bonding Act the majority ignore those important facts and hold that when the property owners signed the applications a "binding contract" was thereby created and that it was governed by the Bancroft Bonding Act. To support their holding the majority cite previous decisions of this court in all of which except *Paget v. City of Pendleton,* 219 Or 253, 346 P2d 111, the property owner had signed an application of the kind which is authorized by ORS 223.215. The Paget case involved no bonds or any application for them. In each of the other cases Bancroft bonds were issued after the applications had been filed by the city. In this case the city did nothing whatever with the applications when they were presented. It issued no bonds. It makes no claim by pleading or evidence that any bonds were issued. The answer (of the city) alleges the dates when it says the plaintiffs signed the purported applications for bonding. Virtually all of the dates were after the time specified in the Bancroft Bonding Act for filing applications had expired. Possibly that circumstance accounts for the fact that the city did nothing with the applications. The latter were not produced at the trial and no one mentioned their whereabouts.

As just indicated, the majority hold that some of the plaintiffs signed applications for bonding of the kind above described. I do not believe that it is established that any of them signed applications, but for the purposes of this case I will assume that they did.

I just mentioned that after the purported applications were signed the city did nothing about them.

Likewise, it must be added that the city makes no contention that after the purported applications were filed it pursued the course prescribed by the Bancroft Bonding Act whereby the applicant is granted a legally enforceable right to pay the assessment in installments. And it is also worthy of mention that the city's extensive pleadings make no averment that after the purported applications were filed it changed its position in reliance upon them one iota, or that it will be prejudiced unfairly a single penny if the plaintiffs are given the relief which they seek. Since the city did nothing about the applications this case ought to stop at this point; but, as we have seen, the majority hold that when the applications were signed a "binding contract" came into effect. They also declare "such an application forms a contract between the city and the property owner and the * * * property owner may not thereafter judicially challenge the assessment." The holdings just quoted are tantamount to ruling that when a man makes an offer he is bound to take the course set forth in his offer even though the offeree spurns the offer. Likewise, it is tantamount to holding that when a man obtains a marriage license he is married ipso facto and must from that moment on support the woman even though no marriage ever takes place. In other words, the majority hold that the property owner is bound by his application from the moment he files it even though the city does nothing about it. I will later pursue these matters further, but for the present will content myself with the observation that since the city did nothing about the applications and does not claim by pleading or evidence that it issued any bonds, the case should stop right here.

I said that the city required the property owners

to sign applications for bonding which contained a provision unauthorized by the Bancroft Bonding Act. Here it is:

> "I (we) do hereby acknowledge I am (we are) indebted and the property hereinafter described legally charged with the above named assessment amounting to          for the making of said improvement."

I have not inserted the amount of the individual assessment because it varied with the different properties. ORS 223.215, of the Bancroft Bonding Act, says that the application:

> "* * * shall state that the applicant and property owner does thereby waive all irregularities or defects, jurisdictional or otherwise, in the proceedings to cause said improvement to be constructed or made for which the assessment is levied and in the apportionment of the cost thereof. The application shall provide that the applicant and property owner agrees to pay the assessment in 20 semi-annual installments."

It will be noticed that the Bancroft Bonding Act, unlike the provision which the city of Salem included in its application forms, does not require an applicant for bonding to renounce his right to contest the amount fixed by the city as the cost of the improvement. Under the Bancroft Bonding Act the property owner can question that amount and secure a judicial decree upon the subject. In *Parker v. Hood River,* 81 Or 707, 160 P 1158, an attack of that kind succeeded and the plaintiff was relieved from the burden of paying $193.44 upon a street assessment which was levied after he had filed a bonding application under the Bancroft Bonding Act.

Obviously, the words "agrees to pay the assessment" which are a part of ORS 223.215 are not in-

tended to impose a personal debt upon the property owner. Those words are used throughout our statutes which impose taxes upon real property. But the term inserted by the city in its prescribed form of application, "I am indebted" plainly imposes a personal debt upon the applicant. *Parker v. Hood River,* supra, through quotation from *Ivanhoe v. Enterprise,* 29 Or 245, 45 P 771, 35 LRA 58, stated that "It is extremely doubtful" whether such a provision is constitutional. ORS 223.210 says that the assessments for the cost of the improvement shall be made in harmony with "the provisions of the charter or ordinances of such city." Accordingly, the city can not include in the cost of the improvement amounts unauthorized by the charter and the ordinances. ORS 223.210 which prohibits the inclusion in the total charge for the improvement of items that are not authorized by "the provisions of the charter or ordinances" of the city is the only protection which the property owner has against excessive charges.

From the above we see that the Bancroft Bonding Act does not require the property owner (1) to waive his right to question the amount which the city charges for the improvement, (2) to agree that he will pay any sum, whether right or wrong, which the city inserts in his application as his share of the cost of the improvement, (3) to render himself personally liable for the sum which the city officials insert in the bonding applications which they submit to him. Since it is highly important, I repeat: The Bancroft Bonding Act does not require the property owner to waive his right to question the amount which the city officials charge as the cost of the improvement.

It must be clear that the city included in the application which it required the plaintiffs to sign a provi-

sion which was unauthorized by the Bancroft Bonding Act. Since the city claims that this case is governed by the Bancroft Bonding Act, and since the majority so hold, it necessarily follows that the unauthorized provision is ultra vires to the powers of the city. Rhyne, Municipal Law, § 10-3. The provision thus wrongfully included is plainly material and is likewise plainly prejudicial to the property owners. Further, it is indispensable to the majority's position. When that provision is recognized as beyond the city's powers the majority have no foundation for their holding.

To sustain their position the majority cite decisions of this court without mentioning these two important distinguishing facts: (1) In all of the cited decisions the applications were of the kind authorized by ORS 223.215 and contained no interloping provisions, and (2) In all of the cited cases (with the exception of *Paget v. City of Pendleton,* supra, which involved no bonds of any kind) the city issued Bancroft bonds after the applications were filed. In this case no bonds were issued and in fact the city did nothing whatever after the applications were filed. The provision of the application which is unauthorized by ORS 223.215 and which required the property owner to forego the right given him by the Bancroft Bonding Act to challenge the amount fixed by the city as the cost of the improvement must be deemed beyond the city's power and must be given no effect.

The majority holding does violence to the Bancroft Bonding Act which was intended to enable property owners of limited means to have the street in front of their property improved. The present construction turns the act against the property owner.

The above is not the only basis of my dissent. Although the plaintiffs deny that any of them signed

applications for Bancroft bonding, I will pass that issue by and, for the purposes of this appeal, assume that applications of the kind described by the majority were signed.

The majority, after holding that the plaintiffs signed the bonding applications which I have described, rule "such an application forms a contract between the city and the property owner and the * * * property owner may not thereafter judicially challenge the assessment." In all of the cases cited by the majority with the exception of the Paget case (1) the applications for bonding conformed to the provisions of ORS 223.215 and (2) the city, after pursuing the course prescribed by the Bancroft Bonding Act, issued bonds. In this case the city makes no contention through its pleadings or evidence that it issued any bonds. Likewise, neither the city's pleadings nor any of its witnesses contended that the city changed its position because of the bonding applications which the majority say the plaintiffs signed. Bonds do not issue automatically or as a matter of course. ORS 223.220 restricts the amount of bonded indebtedness which any property owner may place against his property and requires a city official to make certain that the limitation is not exceeded. ORS 223.295 places a limitation upon the amount of Bancroft bonding which any city may incur and requires a check-up by the city to assure that the limitation is not exceeded before the applications for bonding are honored. If those check-ups have been made and the applications have not been rejected (ORS 223.220) the city then inaugurates the bonding procedure by enacting the ordinance which is required by ORS 223.235. ORS 223.240 requires the adoption of still another ordinance which fixes the maturities and other features of the bonds.

Accordingly, when the procedure just reviewed has been pursued by the city it has accepted the property owners' applications and has bound itself to issue bonds. But until that procedure has been pursued and the ordinances have been adopted the applications are merely pending and have the same status as an offer which is awaiting acceptance. But when the procedure above mentioned has been pursued and the ordinances have been enacted the property owner is assured that the city can not foreclose the assessment against his property if he fails to pay it in full at once. In this case no one claims that any bonds were issued. If any of the above procedure was followed by the city no one breathed a word of it at the trial. So far as the record discloses, the city is at liberty to foreclose its assessments at any time that it chooses except as to those property owners who have paid in full. If the city has accepted installment payments it has done so as a matter of grace.

The foregoing brief review of the Bancroft Bonding Act renders it clear that the mere signing of an application for bonding does not create a contract. As we saw, ORS 223.220 makes express provision for the rejection of applications. ORS 223.210 provides that applications for bonding must be filed "within ten days after notice of such assessment is first published." Scarcely any of the applications were filed within that time limitation. The majority's holding that the mere filing of the applications created a contract certainly does violence to the Bancroft Bonding Act.

When the majority hold that "such an application forms a contract" between the property owner and the city, they can point to no consideration whatever moving from the city for the purported contract. The

majority do not rest their case upon a waiver, but hold "such an application forms a contract." If the property owner has bound himself by contract not to contest the charge made by the city, however excessive it may be, he has given up a valuable right and should have a correspondingly large quid pro quo. But the city mentions none. Its extensive pleadings do not allege that any contract was formed. They nowhere use such a term as "contract," "agreement" or "consideration." Clark on Code Pleading, page 190, says "the consideration for the contract must be alleged." Nor does the city allege that it has permitted the property owners to pay in installments or that it has bound itself to accept installment payments. Possibly the majority will say that the city has permitted the property owners to pay in installments, and that its beneficent act in so doing is consideration. I repeat that the city's pleadings do not allege that it has granted the property owners the right to pay in installments and no witness mentioned the grant of any such right. If any one thinks that the circumstances just mentioned afford a semblance of consideration for the contract which the majority say was formed, he faces the fact that the Bancroft Bonding Act is not satisfied with a privilege which depends upon the city's grace or beneficence. The majority hold, as we have noticed, that when the property owners signed the applications they entered into a contract with the city which was governed by the Bancroft Bonding Act. If such a contract was formed the plaintiffs are entitled to nothing less than a legally enforceable right to pay the assessment in installments. They have received nothing of that kind and the city makes no claim that they have. There is no basis whatever in this case for ruling that the plaintiffs received any consideration.

This case was first argued before five members of this court more than seven months ago. At that time the city argued that the plaintiffs who signed the applications for bonding estopped themselves thereby from challenging the amount which the city fixed as the cost of the improvement. The city's answer through a series of "further defenses," seven in number, alleged estoppel but never once used a term such as "contract," "agreement" or "consideration." The city's (appellant's) brief which it filed in this court submits as "the question presented for decision" the following:

> "The defendant city of Salem questions the holding of the lower court that the plaintiffs who bonded under the Bancroft Act are *not* estopped to deny the validity of the street improvement."

Nothing was said about a contract.

The five members of the court who heard the appeal thoroughly explored the contentions about estoppel but were unable to agree. Then the case was heard by all of the seven justices. Again the city argued that the property owners, by signing the applications, estopped themselves from contesting the amount which the city fixed as the cost of the improvement. No claim was made that the city parted with any consideration or issued any bonds. Now the majority opinion says, "It was not a question of estoppel; the applications created a bonding contract." Thus, the case is decided upon a proposition that was not even mentioned in the pleadings.

We see from the foregoing that the majority have rejected the theory upon which the circuit court decided the case and have also discarded the "question presented" which the city submitted as the basis of its appeal. They have become satisfied that the plaintiffs are not estopped to challenge the sum which the city

set unilaterally and ex parte as the cost of the improvement, but hold that the plaintiffs agreed by contract to pay that sum. That contract, assuming that one was actually effected, has no consideration and was exacted of the plaintiffs in violation of the Bancroft Bonding Act.

The majority itself has no respect for the purported contract which it brings forth in the above novel manner, for immediately after holding that the signing of the applications formed "a contract between the city and the property owner," and that "the assessed owner may not thereafter judicially challenge the assessment," it sustains in full the plaintiffs' challenge to the charge for laying sidewalks in the intersection. No separate contract existed as to the sidewalks in the intersections. The city charged a total of $3,255.88 for sidewalks and in that total included the cost of laying the sidewalks in the intersections. If the plaintiffs, as the majority hold, agreed to pay the total cost of the improvement ($15,575.24) why are they excused from paying for the sidewalks in the intersections which constitute a part of the total? If the majority say that the charter does not authorize a charge for sidewalks in the intersections, it speaks to similar effect concerning many of the other charges from which the plaintiffs also seek relief. The simple fact is that by signing the applications the plaintiffs did not agree to pay the sum which the city fixed unilaterally and ex parte as the cost of the improvement. The majority appear to accept the rationale of *Parker v. Hood River*, supra. The cause should be remanded to the city with instructions to eliminate from the total assessment not only the cost of the sidewalks in the intersections but all other unauthorized charges.

It will be noticed that the majority does not mention the sum which should be stricken from the total charge as the cost of laying the sidewalks in the intersections. The reason why that sum is not expressed by the majority is because it is not revealed by the record. Nevertheless, the majority state: "the total cost records were available" to the plaintiffs. But even now the majority can not determine from them the cost that the city incurred in laying the sidewalks in the intersections. When the city engineer was testifying he was asked to produce the part of his records which showed the cost of constructing the sidewalks in the intersections. He indicated he had no records of that kind and then added that considerable time would be involved in making the computation. He suggested that he be permitted to make the calculation during that evening. Obviously, if his records showed the expense he could have produced the record at once. He had sworn that he had all of his record concerning this job in court with him. The following morning, when the city engineer returned to the witness stand, he was asked for the figure. It then developed that he had not completed the calculation and he promised to complete it that evening. The next morning when he was asked for the cost of laying the sidewalks in the intersection he gave the total number of square feet of sidewalk in the intersection. He was then told that the plaintiffs wished to know the cost that the city incurred in laying that amount of sidewalk. He did not reply to that question, but stated that in construction work we "have a cost factor per square foot" of "decimal 32496796." This incident which is only one of many shows how impossible it would have been for any of the property owners to have determined whether the city's total charge of $15,575.24 was the true cost

of the improvement when the city demanded that they sign a bonding application stating:

"I do hereby acknowledge that I am indebted and the property hereinafter described legally charged with the above named assessment amounting to          for the making of said improvement."

The city, of course, wrote in the blank space an amount.

Ordinance No. 1487 of the city required the city recorder to maintain a book pertaining to each local improvement and enter in it the costs incurred in making the improvements. The majority opinion, in referring to that ordinance, terms it "an old ordinance of the city which required antiquated accounting methods." In 1940 this ordinance was included by the city in its code of ordinances. In 1950 it was amended, and in 1956 it was again included in a compilation of ordinances entitled by the city "Code of the City of Salem." Plainly the majority's characterization of this ordinance does violence to the facts. The majority's opinion, further referring to this ordinance, states: "The city had not literally followed the letter of this ordinance." When the city recorder was asked for the records which Ordinance No. 1487 required him to maintain, his answer was, "I don't keep those records any more." He kept no cost records of any kind concerning this improvement, but expressed a belief that the city engineer had some. The engineer testified that he kept no cost records. The majority's statement that the city "had not literally followed the letter of this ordinance" is an impressive understatement. But putting matters of that kind aside, is it not most unjust to charge the plaintiffs with knowledge of the cost of the items which went into this work when no records of cost were anywhere available? When the

city engineer was upon the witness stand and was testifying concerning cost records he was told more than once, "Produce them," but in each instance nothing came forth.

Accordingly, it was impossible when the improvement was completed and the city, without notice to any of the property owners, unilaterally fixed the cost of the improvement as $15,575.24, for any of the plaintiffs to have determined whether that sum was correct or not. As we see from what has been said, it is even now impossible to determine how much the city expended in the construction of the sidewalks in the intersection. The same is true of the cost of laying the pavement. It was estimated by the city engineer while he was upon the witness stand. Because the city's cost records were wholly inadequate the trial judge entered the challenged decree.

The majority cast the plaintiffs in the role of individuals who are seeking to take an unfair advantage of the city. The prevailing opinion is unjustified in so treating them. Very likely, since the majority entertain that conception of the plaintiffs, they have fallen into the errors pointed out in preceding paragraphs. The plaintiffs' own pleading states:

"The street improvement was in fact made resulting in legal benefits to the respective properties thus empowering the City of Salem to assess actual costs within the Charter provisions."

All of the plaintiffs favored the improvement. Many of them signed petitions addressed to the city requesting that it make the improvement. We see from the quotation just made that they are entirely willing to pay their share of the improvement's cost. They presented evidence incapable of misunderstanding showing that many items were included in the cost of the

improvement that were not warranted by the charter and ordinance provisions. One large charge was actually included twice, but under different heads.

From the foregoing we see that ORS 223.210 states that the assessment shall be made in harmony with "the provisions of the charter or ordinances" of the city. In other words, that unauthorized sums shall not be included in the total cost. We also see from ORS 223.215 that the provisions for bonding as prescribed in that section of the Bancroft Bonding Act does not contemplate that there shall be included in the applications any waiver of the property owners' right to contest the cost of the improvement as fixed by the city officials. To permit a city official to insert in an application for bonding a given sum of money and then require the property owner to forego his right to contest is a most unwholesome ruling to make. No court should countenance anything of that nature, and yet that is the exact thing that the majority are doing. Further, it is seen that since the city issued no bonds and did absolutely nothing after the purported applications were filed the plaintiffs have received no consideration whatever for the so-called contract which the majority say they entered into, that is, a contract to forego the questioning of the total cost of the improvement.

When this case was before the trial judge he found it impossible to determine from the records before him the cost of the improvement. He saw the witnesses, saw the documents and asked questions of many of the witnesses. He, far better than we, was in a position to determine whether the records would have enabled any of the plaintiffs to have calculated the cost of the improvement. He ruled that the records were so incomplete that the only possible solution was to declare

the assessment void. The entire matter should be remanded to the city with instructions to make a reassessment. We must bear in mind that the cost of the improvement was determined by the city without any notice whatever to the plaintiffs and without any opportunity for them to be heard. Within eight days one of them protested. Then requests were made for a hearing, but none was given. This ex parte determination of costs should not be held beyond the power of the plaintiffs to question.

The plaintiffs who, as good citizens, paid their assessments should not be denied recovery of the excess payments which the city demanded of them. Section 79A of the Salem charter makes express provision for the recovery of such sums. ORS 311.806 (1)(c) is to similar effect as to excess payments made to a state or a county body. Moreover, the rule is virtually universal that one who pays without the means of determining the true amount may recover the excess.

I dissent.

McAllister, C. J., concurs in this dissent.